COPY

Ira G. Greenberg
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendants
750 Lexington Avenue, 8th floor
New York, NY 10022
(212) 308-4411

08 CV 01311

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEW YORK
COUNTY CLERK'S OFFICE

FEB 08 2008

NOT COMPARED
WITH COPY FILE

-----------------------------------------------------------x

ROBERT T. PUOPOLO,

               Plaintiff,

      versus

EQUINOX CAPITAL, INC., EQUINOX
PARTNERS III, LLC, and STEVEN C.
RODGER,

             Defendants.

NOTICE OF REMOVAL

-----------------------------------------------------------x

        Defendants Equinox Capital, Inc., Equinox Partners III, LLC, and Steven

C. Rodger hereby remove this action to this Court and respectfully show this Court as

follows:

        1.    This action was commenced by the filing of a summons and

complaint on or about January 29, 2008. A copy of the summons and complaint is

attached. No further proceedings have taken place in this action.

        2.    Service of process was effectuated upon all defendants on or about

January 31 or February 1, 2008, and was first received on or about that date. Receipt

of such process in that manner was the first receipt of a copy of the complaint in any

manner. Thus, removal is timely.

Ira G. Greenberg
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendants
750 Lexington Avenue, 8th floor
New York, NY 10022
(212) 308-4411

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

ROBERT T. PUOPOLO,

                         Plaintiff,                          No.

         versus

EQUINOX CAPITAL, INC., EQUINOX
PARTNERS III, LLC, and STEVEN C.
RODGER,              ,                        NOTICE OF REMOVAL

                         Defendants.

----------------------------------------------------------x

Defendants Equinox Capital, Inc., Equinox Partners III, LLC, and Steven

C. Rodger hereby remove this action to this Court and respectfully show this Court as

follows:

        1.      This action was commenced by the filing of a summons and

complaint on or about January 29, 2008. A copy of the summons and complaint is

attached. No further proceedings have taken place in this action.

        2.      Service of process was effectuated upon all defendants on or about

January 31 or February 1, 2008, and was first received on or about that date. Receipt

of such process in that manner was the first receipt of a copy of the complaint in any

manner. Thus, removal is timely.

3.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441.  On information and belief, plaintiff Robert T. Puopolo is a citizen of New York.  Defendant Equinox Capital, Inc. is a Delaware corporation with its principal place of business in Connecticut; defendant Equinox Partners III, LLC is a limited liability company all of whose members are citizens of Connecticut; and defendant Steven C. Rodger is a citizen of Connecticut.  The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, in that the damages sought in the complaint are in excess of $5 million.

4.       Written notice of the filing of this notice of removal shall be served upon counsel for plaintiff Robert T. Puopulo and filed with the Clerk of the Supreme Court of the State of New York, County of New York, promptly after the filing of this notice of removal.

Dated:  New York, NY
         February 7, 2008

Ira G. Greenberg
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendants
750 Lexington Avenue, 8th floor
New York, NY  10022
(212) 308-4411

TO:    .

Eric P. Heichel, Esq.
EISEMAN LEVINE LEHRHAUPT & KAKO-
    YIANNIS, P.C.
Attorneys for Plaintiff
805 Third Avenue
New York, NY  10022
(212) 752-1000

NYC_292715_1/IGREENBERG

Eric P. Heichel
Eiseman Levine Lehrhaupt
 & Kakoyiannis, P.C.
805 Third Avenue
New York, NY 10022
212-752-1000
*Attorneys for Plaintiff*

NEW YORK
COUNTY CLERK'S OFFICE

JAN 2 9

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

ROBERT T. PUOPOLO,

                                    Plaintiff,

EQUINOX CAPITAL, INC., EQUINOX PARTNERS III,
LLC, and STEVEN C. RODGER,

                                    Defendants.

-------------------------------------------------------------------x

Index No. 600277/08

Date Purchased 1/29/08

**SUMMONS**

Plaintiff designates N.Y. Co.
as the place of trial

The basis of venue is the
residence of the plaintiff.

**To the Above Named Defendants:**

    ***YOU ARE HEREBY SUMMONED*** to answer the complaint in this action and

to serve a copy of your answer, or, if the complaint is not served with this summons, to

serve a notice of appearance, on the plaintiff's attorneys, within 20 days after service of

this summons, exclusive of the day of service (or within 30 days after service is complete

if this summons is not personally delivered to you within the State of New York); and in

case of your failure to appear, answer or move, judgment will be taken against you for the

relief demanded in the complaint.

Dated:     New York, New York
              January 29, 2008

EISEMAN LEVINE LEHRHAUPT
& KAKOYIANNIS, P.C.

By:_____

    Eric P. Heichel
    Eiseman Levine Lehrhaupt
     & Kakoyiannis, P.C.
    805 Third Avenue
    New York, NY 10022
    212-752-1000
    *Attorneys for Plaintiff*

    Of Counsel:
    Jeffrey A. Fromm
    Jonathan C. Marquet

TO:    Equinox Capital, Inc.
        41 West Putnam Avenue
        Greenwich, Connecticut 06830

        Equinox Partners III, LLC
        41 West Putnam Avenue
        Greenwich, Connecticut 06830

        Steven C. Rodger (Home Address)
        623 Lake Avenue
        Greenwich, Connecticut 06830

        Steven C. Rodger (Business Address)
        41 West Putnam Avenue
        Greenwich, Connecticut 06830

2

Eric P. Heichel
Eiseman Levine Lehrhaupt
  & Kakoyiannis, P.C.
805 Third Avenue
New York, NY 10022
212-752-1000
*Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X

| | |
|---|---|
| ROBERT T. PUOPOLO,             : | Index No.: |
|                     : | |
|       Plaintiff,         : | |
|                     : | |
|     -against-         : | |
|                     : | |
| EQUINOX CAPITAL, INC.,    : | **COMPLAINT** |
| EQUINOX PARTNERS III, LLC,   : | |
| and STEVEN C. RODGER,     : | |
|                     : | |
|       Defendants.     : | |

-------------------------------------------------------------X

Plaintiff Robert T. Puopolo ("Puopolo"), by his attorneys, Eiseman Levine Lehrhaupt & Kakoyiannis, P.C., avers for his complaint, upon information and belief, except as to his own actions and statements, which are alleged upon personal knowledge, as follows:

## INTRODUCTION

1.    This is an action for declaratory relief, specific performance and money damages of $5.735 million arising from various breaches of contracts, fiduciary duties and duties of good faith and fair dealing between and among plaintiff, on the one hand, and Equinox Capital, Inc. ("Equinox Capital"), Equinox Partners III, LLC ("Equinox Partners III"), and Steven C. Rodger ("Rodger"), on the other hand.

2.      Equinox Partners III is an investment manager and Equinox Capital is a management company.  Rodger, the individual defendant, controls all of the Equinox entities, including defendants Equinox Capital and Equinox Partners III.  The Equinox entities and Rodger will occasionally be referred to collectively herein as "Equinox."

3.      Puopolo was a member of Equinox Partners III and was employed as a managing director of Equinox Capital until April 19, 2007, when he was summarily dismissed without cause by the defendants.  Puopolo had a succession of two written contracts with the defendants, setting forth his rights as a member of Equinox Partners III and as an employee of Equinox Capital.

4.      Puopolo is entitled to, but has been denied, compensation from the proceeds of deals for three transactions completed by Equinox.  Puopolo is now due various forms of compensation for the transactions involving:  (i) St. Matthew's University, Inc. (the "SMU Investment"), (ii) Comprehensive NeuroScience, Inc. (the "CNS Investment"), and (iii) Saba University School of Medicine B.V. and the Medical University of the Americas Ltd. (the "SABA/MUA Investment").

5.      In short, Equinox is now withholding and refusing to acknowledge and/or pay the vast majority of the compensation due to Puopolo.

### THE PARTIES

6.      Puopolo is a natural person who currently resides in New York, New York.

7.      Puopolo is the managing member of Epic Partners II, LLC and the managing member of Epic SMU LLC.

2

8.    Until his termination without cause, on or about April 19, 2007, Puopolo was a member of Equinox Partners III and was employed as a managing director of Equinox Capital.

9.    Equinox Capital is a corporation formed pursuant to the laws of the State of Delaware. Equinox Capital currently has its principal place of business located at 41 West Putnam Avenue, Greenwich, Connecticut 06830. Equinox Capital is the manager of Equinox Partners III pursuant to the Amended and Restated Operating Agreement of Equinox Partners III (the "Operating Agreement").

10.    Equinox Partners III is a limited liability company formed pursuant to the laws of the State of Delaware. Equinox Partners III currently has it principal place of business located at 41 West Putnam Avenue, Greenwich, Connecticut 06830.

11.    Rodger is a natural person who currently resides at 623 Lake Avenue, Greenwich, Connecticut 06830. Rodger is the president of Equinox Capital and is the managing member of Equinox Partners III.

## BACKGROUND

12.    At all times, both prior to the investments and transactions at issue in this action and through the date of this complaint, Puopolo was a limited partner in Equinox Capital III, L.P. – a private equity fund that made some of the equity investments at issue in this litigation. As a limited partner, Puopolo's role was as a passive investor. Puopolo's status and rights as a limited partner in Equinox Capital III, L.P. are not the subject of claims in this litigation.

13.    Equinox Capital III, L.P. is a private equity fund. A private equity fund is a type of active investment vehicle that raises capital from passive limited partners and

invests that capital in private equity securities (*i.e.*, equity securities that are not publicly traded) of undervalued and growth companies.

14.    Equinox Partners III is the general partner of Equinox Capital III, L.P.

15.    Typically, the general partner of a private equity fund makes the investment decisions on behalf of the fund.

16.    Equinox Partners III made the investment decisions for Equinox Capital III, L.P.

17.    Equinox Capital is an operating entity that manages Equinox Partners III. As is typical, Equinox Capital is the single operating entity, which has employees, office space and office equipment, and serves as the management company through which all day-to-day actions are taken.

18.    Under the terms of the Operating Agreement and other relevant operating documents, all operations of Equinox Partners III and Equinox Capital were subject ultimately to the sole control of Rodger, the managing member of Equinox Partners III and the President of Equinox Capital.

19.    Puopolo is an investment banker and private equity investor with over twenty five years of experience. Prior to joining Equinox Partners III as a member and Equinox Capital as a managing director, he was the managing member of a firm called Epic Partners II, LLC ("Epic Partners II"). After joining Equinox Partners III, as described below, Puopolo left Epic Partners II dormant, and from the period of May 12, 2005 to April 19, 2007, Puopolo conducted all of his business activities through Equinox Partners III (except for limited activities in connection with prior investments and financial advisory assignments, as expressly agreed with Equinox Partners III).

4

20.     For substantially all of the past nine years, Puopolo has focused on investing in and providing financial advisory services to companies in the for-profit education and training industry, including for-profit post-secondary educational institutions. In particular, Puopolo has considerable skill, expertise and experience in the area of for-profit offshore medical schools.

21.     St. Matthew's University, Inc. is a private, for-profit medical school located in the Cayman Islands, with its headquarters located in Orlando, Florida.

22.     Based on his prior long-standing personal and business relationship with Rodger, Puopolo proposed to Rodger, in 2005, that Equinox should undertake the SMU Investment. The possibility of the SMU Investment was the result of detailed research, analysis and extensive solicitation and negotiations with St. Matthew's University, Inc., done over the course of almost two and a half years by Puopolo. The predicate for this discussion was the parties' mutual interest in Puopolo becoming an active member of Equinox Partners III and participating fully in the Equinox business.

23.     Earlier, Puopolo's company, Epic Partners II, negotiated, and in April 2005 executed, with St. Matthew's University, Inc., a letter of intent for the acquisition of St. Matthew's University, Inc. (the "SMU Letter of Intent"). The SMU Letter of Intent contained an exclusivity provision protecting Epic Partners II's right to acquire St. Matthew's University, Inc., as well as a $300,000 unconditional expense reimbursement in the event that the acquisition transaction did not close. The SMU Letter of Intent outlined the basic structure of the acquisition transaction.

5

24.    As part of Puopolo's becoming a member of Equinox Partners III and a managing director of Equinox Captial, Epic Partners II's rights under the SMU Letter of Intent were assigned to Equinox Partners III.

The Contracts

25.    After Rodger conducted an analysis of the potential SMU Investment, Equinox Capital, on behalf of itself and Equinox Partners III, entered into a contract with Puopolo (also included was Epic Partners II, LLC), dated May 12, 2005 (the "May Contract"), whereby (i) the SMU Investment would be undertaken by Equinox Partners III, (ii) Puopolo became a member of Equinox Partners III, and (iii) and Puopolo became an employee of Equinox Capital. A true and correct copy of the May Contract is annexed hereto as Exhibit A.

26.    The May Contract included, among other provisions (see Exhibit A hereto), provisions concerning the various forms of consideration plaintiff was to receive, provisions concerning Puopolo's duties and responsibilities in connection with his membership in Equinox Partners III and his employment at Equinox Capital, and provisions concerning Puopolo's appointment to the Board of Directors of the entity that would constitute and control St. Matthew's University, Inc. once the SMU Investment was complete.

27.    The May Contract was negotiated by Rodger on behalf of Equinox.

28.    Once the May Contract was executed, the defendants undertook due diligence in connection with the SMU Investment.

29.    In November 2005, Equinox Capital, again on behalf of itself and Equinox Partners III, entered into another contract with Puopolo (it also included Epic Partners II

6

as well as Epic SMU LLC – an entity created and controlled by Puopolo for purposes of

holding part of the interest in St. Matthew's University, Inc.), dated November 23, 2005

(the "November Contract"), which amended the terms of the May Contract. A true and

correct copy of the November Contract is annexed hereto as Exhibit B.

30.    The November Contract was negotiated by Rodger on behalf of Equinox.

31.    The November Contract reiterated that (i) the SMU Investment would be

undertaken by Equinox Partners III (with some participation by Epic Partners II and Epic

SMU LLC), (ii) Puopolo was a member of Equinox Partners III, and (iii) Puopolo was an

employee of Equinox Capital.

32.    The November Contract amended two components in the May Contract.

The first set forth the contractual terms between and among Puopolo, Equinox Capital,

Epic SMU LLC, and Epic Partners II in connection with the SMU Investment. The

second set forth the contractual terms between and among Puopolo, Equinox Capital and

Equinox Partners III, in connection with Puopolo's membership in Equinox Partners III

and employment by Equinox Capital.

33.    The relevant portions of the first part of the November Contract state:

> 1. Assignment of Rights: In consideration of the provisions
> of the Letter, Epic Partners irrevocably assigned its rights
> under certain letter agreement dated April 22, 2005
> between [St. Matthew's University, Inc.'s] and Epic
> Partners.
>
> 2. Board: Equinox will appoint Robert T. Puopolo to the
> [St. Matthew's University, Inc.'s] Board of Directors.
>
> 3. Epic's Role: Subject to Equinox's constraints and desires,
> Epic Partners will assist in structuring, negotiating, and
> financing the transaction.
>
> 4. Transaction Fees: Epic Partners to receive a cash fee

7

equal to $1 million at the closing.

5. Equity: Epic SMU to purchase for $1,000 fully-vested ten-year warrants to purchase (i) an initial 7% interest in [St. Matthew's University, Inc.'s] equity securities at an exercise price equal to the price paid in the transaction plus a premium of 10%, and (ii) an additional 2.5% interest in [St. Matthew's University, Inc.'s] equity securities at an exercise price equal to the price paid in the transaction plus a premium of 200%. Such warrants will be subject to dilution by any equity-related securities issued to third party providers of debt and/or members of [St. Matthew's University, Inc.'s] management.

6. Management Fees: Robert T. Puopolo or Epic Partners, at Mr. Puopolo's sole discretion, to be paid 50% of any management fees received by Equinox from [St. Matthew's University, Inc.] in connection with the initial acquisition. Such payment will be made in a timely matter after receipt by Equinox.

34.    The relevant portions of the second part of the November Contract state:

1. Carried Interest: Robert T. Puopolo shall receive a Sharing Percentage of 5%, as that term is defined in the Amended and Restated Operating Agreement of Equinox Partners III, LLC (the EP III Agreement"), in Equinox Partners III, LLC ("EP III") for the current investment year as well as 2004.

Mr. Puopolo's Sharing Percentage will be subject to the terms and conditions of the EP III Agreement. Prior to receiving this Sharing Percentage, Robert T. Puopolo will become a party to and agree to be bound by the terms of the EP III Agreement as well as enter into an Employment Agreement with Equinox.

In the event that the acquisition of St. Matthew's University is consummated and Equinox Capital III, L.P. makes an investment in such transaction, then Robert T. Puopolo's Sharing Percentage in EP III will be increased to 12.5%.

2. Status: Until such time as Mr. Puopolo is able to become a full-time partner, Mr. Puopolo will be a part-time partner. At such time as Mr. Puopolo desires to become a full-time partner, Equinox and EP III will reevaluate its arrangements with Mr. Puopolo, including the Sharing

8

Percentage.

3. Title: Mr. Puopolo will have the same title as Mark
Durfee and John Wechsler in Equinox.

4. Obligations/Non-Compete: As outlined in various
documents, as a condition to Mr. Puopolo's receiving a
Sharing Percentage in EP III, Mr. Puopolo will be obligated
to devote his entire business efforts to the business of
Equinox and EP III. This obligation, however, will not
prevent or interfere with Mr. Puopolo's ability to perform
his duties to Corporate Training Holdings, Inc. ("NCTI"),
Met Schools, Inc., Helma Institute LLC, Oasis Children's
Services LLC and Sint Eustatius Management Corp.
("Statia"). Equinox acknowledges that Mr. Puopolo,
through an affiliate of Epic Partners, has an indirect equity
interest in Statia, the parent company of the University of
Sint Eustatius School of Medicine and a competitor to St.
Matthew's. To the extent that EP III makes an investment
in St. Matthew's, then Mr. Puopolo will not provide any
services to Statia.

5. Additional Subscription:  In consideration for the terms
contained in the Letter, irrespective of whether or not the
transactions contemplated herein with St. Matthew's
University occur, Mr. Puopolo has committed to an
additional subscription as a limited partner in Equinox
Capital III, L.P. of $200,000.

6. Investment Committee: Mr. Puopolo will become a
member of Equinox Partners III, LLC's investment
committee.

*See* Exhibit B at 2-4.

35.    Accordingly, as a member of Equinox Partners III, Puopolo was entitled to

receive a "sharing percentage" in the "carried interest" on every investment closed by

Equinox Partners III – whether he initiated the business or not.

36.    In private equity firms, the "carried interest" is the portion of the

investment gain or other transaction profits realized that is allocated to the investment

manager without the investment manager having made a cash investment.  In other

9

words, the "carried interest" is the cut of the deal taken by the investment manager as compensation for its role in overseeing the making, oversight and disposition of investments.

37.    It is standard practice in the private equity industry that the individual members of a private equity entity receive their sharing percentage from the same carried interest. In other words, although individuals may receive different sharing percentages of the carried interest, each individual's sharing percentage is derived from the same pool of carried interest. Here, the understanding was that – in accordance with the industry standard – Puopolo would receive his sharing percentage in connection with the entire SMU Investment (as well as any other investments by defendants, including the entire CNS Investment and the entire SABA/MUA Investment) from the same carried interest as each of the other members of Equinox Partners III – regardless of the specific entities created and utilized by Equinox Partners III to pass along the carried interest.

38.    Pursuant to the May Contract and the November Contract, Puopolo's sharing percentage in Equinox Partners III was at least 5% for all transactions closed in 2004 forward, but, if the SMU Investment closed, then Puopolo's sharing percentage in all transactions closed in 2004 forward was increased to 12.5%. (The fact that this increase in Puopolo's sharing percentage was retroactive was confirmed by Rodger in a conversation that took place prior to the execution of the May Contract.)

39.    The SMU Investment closed on January 27, 2006. Therefore, the condition subsequent of the November Contract was fulfilled, and Puopolo's sharing percentage of the "carried interest" in all transactions closed by Equinox Partners III from January 1, 2004 forward was 12.5%.

10

40.    Further, the November Contract incorporated the terms of the Operating

Agreement, and also referenced the standardized Employment Agreement with Equinox

Capital (the "Employment Agreement").

41.    The May Contract and the November Contract contained all necessary

terms to form binding contracts. Furthermore, all of the parties performed pursuant to the

May Contract and the November Contract within the context of the Operating Agreement

and the Employment Agreement. True and correct copies of the form Operating

Agreement and Employment Agreement delivered to Puopolo in connection with the

May Contract and November Contract are annexed hereto as Exhibits C and D,

respectively.

42.    The relevant portions of the Operating Agreement state:

> 6.5    Vesting. Prior to the commencement of each
> [calendar year] (except the initial [calendar year]
> commencing on the date hereof and ending on December
> 31), the Investment Committee Chairman shall determine
> the Sharing Percentage of each Member with respect to all
> Investments to be made by the Partnership (and indirectly
> the SBIC Partnership) during such [calendar year] as may
> be adjusted during the course of the [calendar year] as a
> result of a Member becoming a Terminated Member or as a
> result of an admission of a new Member pursuant to Article
> 16 hereof. The Sharing Percentages for each [calendar
> year] shall be attached as an exhibit to this Agreement.
> (a)    The Sharing Percentage of each Member with
> respect to each Investment shall vest as follows:
> (i)    fifteen percent (15%) of such Sharing Percentage
> shall vest on the last day of the [calendar year] in which
> such Investment is made;
> (ii)    an additional twenty-five percent (25%) shall vest
> on the last day of the first calendar year subsequent to the
> [calendar year] in which such Investment is made; and
> (iii)    an additional thirty percent (30%) shall vest on the
> last day of each of the second and third calendar years
> subsequent to the [calendar year] in which such Investment
> is made;

11

\*      \*      \*

(e)    Notwithstanding anything to the contrary provided in this Section 6.5, the unvested portion of the Sharing Percentage of a Member with respect to an Investment shall become fully vested upon the earliest to occur of (i) the discharge, other than for Cause, of such Member, (ii) the death or permanent disability, as reasonably determined by the Investment Committee Chairman in its sole discretion, of such Member, and (iii) in such other instances as the Investment Committee Chairman in its sole discretion shall determine; provided, however, that no such acceleration of the vesting of the unvested portion of the Sharing Percentage of a Member shall occur in the event that such Member is terminated as an employee of the Manager for "Cause."

See Exhibit C at 10 (emphasis added).

43.    The relevant portions of the Employment Agreement state:

3.2    Events of Termination.  Executive's employment shall terminate hereunder:

\*      \*      \*

(e)    effective upon the date set forth in [Equinox Capital's] written notice to Executive for "Cause".
(i)    For this purpose "Cause' means (A) material misconduct or dishonesty; (B) conduct of a criminal nature that may have an adverse impact on [Equinox Capital's] reputation and standing in the community; (C) fraudulent conduct in connection with the business affairs of [Equinox Capital]; (D) any bar against Executive from serving as a director, officer or employee of any firm the securities of which trade publicly or of any licensed SBIC; (E) material breach by Executive of his obligations, duties, and responsibilities under any term or provision of this Agreement; or (F) gross negligence or willful misconduct in the performance of Executive's duties hereunder.
(ii)    [Equinox Capital] shall give Executive written notice of proposed termination under this Section 3.2(e) (the "Cause Notice"), which provides reasonable detail as to the cause and sets forth the date of a meeting of [Equinox Capital's] Board of Directors which date shall be

12

>no sooner than five days after the date on which the Cause
>Notice is given. At such meeting, Executive will honor
>requests by the Board of Directors at the meeting to leave
>the meeting to allow for discussion by the Board of
>Directors without Executive present. At such time as the
>Board of Directors reach a decision with respect to
>Executive's termination, whether at the meeting set forth in
>the notice to Executive, or at a subsequent meeting, if the
>decision to terminate Executive is affirmed by the Board of
>Directors, Executive will be given written notice of such
>affirmation and Executive's employment will terminate on
>the date set forth in such notice.

*See* Exhibit D at 4.

Puopolo's Limited Partnership Interest

44.    In the private equity industry, limited partners make a "capital
commitment" to the private equity fund of which they are a member. A capital
commitment is a binding contract to provide funds to a private equity fund when "called"
to do so. Limited partners are committed up to a certain specified amount of money. In
other words, a capital commitment is an agreement to provide a certain amount of money
to an entity when requested to do so by that entity at some future date. A capital call is
simply the request or "call" for those funds that were previously committed. Typically
calls are for only a specific portion of the commitment – whatever is necessary to fund a
particular transaction or to fund management fees – and not for the full amount of a
commitment at any one time. This structure of capital commitments and capital calls is
utilized by the private equity industry so that funds are only delivered and tied up when
investments are imminent.

45.    Here, Puopolo made a capital commitment of $250,000 to Equinox Capital
III, L.P. when he first became a limited partner in the years prior to becoming a member
of Equinox Partners III. Thereafter, when he became a member of Equinox Partners III,

13

as part of his commitment to associating with only this firm, Puopolo increased his capital commitment to Equinox Capital III, L.P. by $200,000 – to a total of $450,000.

The Investments

The SMU Investment

46.     Due primarily to Puopolo's development of the SMU Investment opportunity and the introduction of such opportunity to Equinox Capital and Equinox Partners III, and due in considerable part to Puopolo's business efforts on behalf of Equinox Capital and Equinox Partners III thereafter, the SMU Investment closed on or about January 27, 2006. At the time the SMU Investment closed, Puopolo was a member of Equinox Partners III and was employed by Equinox Capital.

47.     This transaction was brought to Equinox Partners III by Puopolo, and was the catalyst for the offer of membership in Equinox Partners III and employment by Equinox Capital that was made to Puopolo.

48.     A complex structure of corporations, limited liability companies, and limited partnerships was utilized by defendants to effectuate the SMU Investment. The structure of corporations, limited liability companies, and limited partnerships used by defendants to complete the SMU Investment was devised and controlled by the defendants in this action, after Puopolo's preliminary work in structuring the transaction. After the SMU Investment closed, 89.6 % of St. Matthew's University, Inc.'s Common Stock was owned by Equinox SMU Partners, LLC ("Equinox SMU Partners"), an entity formed and controlled by Rodger via an entity named Equinox SMU Management LLC (the managing member of Equinox SMU Partners), which is in turn managed by Equinox Capital (which, as noted above, is also controlled by Rodger) for the purpose of holding

14

defendants' investment in St. Matthew's University, Inc. A chart, outlining Puopolo's information and belief regarding the structure of corporations utilized by Rodger to effect the SMU Investment is annexed hereto as Exhibit E.

49.    Unbeknownst to Puopolo, defendants structured the SMU Investment to minimize the portion available to provide compensation to Puopolo.

50.    During a short period prior to the consummation of the SMU Investment, Rodger excluded Puopolo from the negotiations and documentation used to consummate such investment, so that Puopolo was unaware of the final structure used to make the investment. Puopolo complained to Rodger at the time about this exclusion, to no avail. However, Puopolo did not learn that the structure had the claimed effect of eliminating Puopolo's economic interest in certain portions of the SMU Investment until Rodger advised him of this at or about the time of Puopolo's termination from Equinox Partners III and Equinox Capital in or about April 2007.

51.    The total equity investment in St. Matthew's University, Inc. engineered by Equinox Capital was $23.5 million.

52.    Of the $23.5 million invested, $19.5 million was funded by outside investors (some of whom were also limited partners or affiliates of limited partners in Equinox Capital III, L.P.). These outside investors are believed to have become entitled to a certain priority on investment returns from the SMU Investment. The remaining $4 million invested was funded by two entities under the control of Equinox Partners III: Equinox Capital III, L.P. and Equinox Capital SBIC, L.P.

53.    The carried interest on the $4 million invested through Equinox Capital III, L.P. and Equinox Capital SBIC, L.P. passed directly to Equinox Partners III.

54.    However, the carried interest on the $19.5 million portion of the investment, which Puopolo expected also to have passed to Equinox Partners III, was placed by Rodger in another entity, believed to be Equinox SMU Management, LLC. Equinox SMU Management, LLC was an entity created by Rodger under the umbrella of Equinox Partners III or Equinox Capital for the purpose, at least in part, of receiving the carried interest on the $19.5 million.

55.    In a draft prospectus that was shown to Puopolo (in fact, as it relates to SMU, the majority of the prospectus shown to Puopolo was written by Puopolo) and distributed to investors, Puopolo was listed as a member of Equinox SMU Management, LLC. However, Puopolo was not provided with final documents concerning his membership interest in Equinox SMU Management, LLC, and it appears that he was either eliminated as a member thereof in the final documents, or that the defendants eventually created some other, unknown entity to receive the carried interest on the $19.5 million.

56.    Regardless of the method employed, the result was the same:  Rodger allocated, to himself and the other members of Equinox Partners III, their respective sharing percentages on the carried interest for the entire $23.5 million of the SMU Investment, while only allocating Puopolo his sharing percentage on the carried interest for the $4 million portion of the SMU Investment.  (To date, Puopolo has not been paid his sharing percentage on the carried interest for the $4 million portion of the SMU investment.)

57.    As discussed above, pursuant to the May and November Contracts, Puopolo is entitled to a 12.5% sharing percentage of the entire carried interest for the

16

SMU Investment. In other words, Puopolo is due his 12.5% sharing percentage on the entire $23.5 million of the SMU Investment, and not just on the $4 million portion of the SMU Investment.

58.     A capital call was presented to Puopolo as a limited partner of Equinox Capital III, L.P. at the time of the SMU Investment, as it was to all limited partners of Equinox Capital III, L.P. Puopolo paid the capital call when due.

The CNS Investment

59.     CNS is an integrated clinical research and knowledge development company specializing in neuropsychiatric and related disorders. CNS designs, implements and analyzes clinical development programs on behalf of pharmaceutical and biotechnology companies and contract research organizations.

60.     Equinox Partners III made an investment totaling $1,410,520 in CNS: $1,029,577 via Series C Convertible Preferred Stock, and $380,943 via Common Stock.

61.     Equinox Partners III closed the CNS Investment on or about November 18, 2004.

62.     Equinox Partners III received a carried interest on the entire $1,410,520 of the CNS Investment.

63.     The members of Equinox Partners III shared in the carried interest on the CNS Investment according to their respective sharing percentages in Equinox Partners III.

64.     Under the terms of the May and November Contracts, Puopolo was a member of Equinox Partners III with a sharing percentage of 12.5% with respect to the carried interest on the CNS Investment.

17

65.    A capital call was presented to Puopolo as a limited partner of Equinox Capital III, L.P. at the time of the CNS Investment, as it was to all limited partners of Equinox Capital III, L.P. Puopolo paid the capital call.

The SABA/MUA Investment

66.    Saba University School of Medicine is a for-profit medical school located in the Netherlands-Antilles. Medical University of the Americas Ltd. is for-profit medical school located in the Caribbean on the island of St. Kitts-Nevis.

67.    Puopolo brought the opportunity for the SABA/MUA Investment to Rodger's attention in or about March 2006, while Puopolo was working at Equinox. Sometime thereafter, Rodger took steps to effect an investment in SABA/MUA, but intentionally concealed his efforts to effect this investment from Puopolo (notwithstanding the fact that Puopolo was a member of Equinox Partners III, an employee of Equinox Capital, and a member of Equinox Partners III's investment committee at the time). As discussed in detail below, Rodger concealed his efforts to effect an investment in SABA/MUA by, among other things: (i) creating or acquiring new entities, unknown to Puopolo, and solely under Rodger's control, through which to effect the transaction, (ii) explicitly instructing the other members of Equinox Partners III and the other employees of Equinox Capital not to disclose to Puopolo Rodger's efforts to effect an investment in SABA/MUA, and (iii) "warehousing" a capital call made to the other limited partners of Equinox Capital III, L.P. in January 2007 but only presented to Puopolo in April 2007, after the SABA/SMU Investment had already closed.

68.    Rodger attempted to conceal the SABA/MUA Investment from Puopolo both to avoid Puopolo's involvement as a member of the SMU Board of Directors

18

(Puopolo believed SABA/MUA was an investment opportunity that properly belonged to SMU) and to attempt to avoid paying Puopolo (who was still a member of Equinox Partners and an employee of Equinox Capital at the time) any sharing percentage on Equinox's investment in the transaction.

69.     Rodger either created or acquired two additional entities to effect the SABA/MUA Investment: EIC Holding, Inc. ("EIC Holding"), Equinox EIC Partners LLC ("Equinox EIC"), and Equinox EIC Management LLC ("Equinox EIC Management") (collectively EIC Holding, Equinox EIC and Equinox EIC Management are referred to as the "EIC Entities"). The EIC Entities were created or acquired by Rodger without Puopolo's knowledge and as part of Rodger's intentional effort to conceal the SABA/MUA Investment from Puopolo.

70.     Rodger eventually caused the EIC Entities to effect the SABA/MUA Investment. Although the precise terms of the investment have never been disclosed to Puopolo (in fact, it was not until after the SABA/MUA Investment closed that Puopolo even became aware that Rodger had pursued the SABA/MUA Investment starting in March 2006), Puopolo has recently learned a few of the financial terms. In short, to the best of Puopolo's knowledge, Equinox Partners III contributed approximately $2.5 million to Equinox EIC and three outside financing sources (York Capital Management, Ares Capital and Prairie Capital) contributed approximately $24.5 million to Equinox EIC. These outside financing sources were the same as the principal outside financing sources Rodger involved in the SMU Investment.

71.     The precise terms and conditions surrounding the contributions made by Equinox Partners III and the outside financing sources to the SABA/MUA Investment are

19

still unknown to Puopolo. However, these contributions, and possibly other contributions still unknown to Puopolo, were utilized by Equinox to acquire the EIC Entities. The result of the transaction was that Saba University School of Medicine and Medical University of the Americas Ltd. were owned and controlled by Equinox through EIC Holding.

72.    Rodger, acting on behalf of Equinox, closed the SABA/MUA Investment using the EIC Entities on April 3, 2007.

73.    On or about April 11, 2007, Rodger contacted Puopolo and informed Puopolo that he had effected the SABA/MUA Investment. Rodger told Puopolo that he had been "warehousing" a capital call that had been presented to all of the other limited partners of Equinox Capital III, L.P. in January 2007 (the "January Capital Call"). Rodger told Puopolo that Puopolo would have to comply with the January Capital Call, and Puopolo did so promptly after being notified thereof.

74.    The January 2007 Capital Call was for the purpose of funding the SABA/MUA Investment.

75.    The January Capital Call was presented to the other limited partners of Equinox Capital III, L.P. in January 2007, and should have been presented to Puopolo at the same time. The apparent purpose of "warehousing" the January Capital Call was to conceal the fact of the impending SABA/MUA Investment from Puopolo and to conceal the precise terms of the SABA/MUA Investment from Puopolo.

76.    Additionally, Puopolo's limited partnership interest in Equinox Capital III, L.P. entitles him to quarterly financial reports. Rodger did not deliver the report for the third quarter of 2007 to Puopolo at the time it was delivered to all of the other limited

20

partners. Instead, delivery to Puopolo was greatly delayed, and only took place after Puopolo demanded delivery from Rodger and his associates.

77.    Under the terms of the May and November Contracts, Puopolo was still a member of Equinox Partners III with a sharing percentage of 12.5% as of the close of the SABA/MUA Investment.

The SMU-SABA/MUA Consolidation

78.    On or about August 22, 2007, Epic SMU LLC (of which Puopolo is the managing member and which was a warrant-holder in St. Matthew's University, Inc.) received a Notice of Change of Control, dated August 21, 2007, along with a Notice of Transfer, dated August 17, 2007, and a Letter of Intent, dated August 16, 2007. These documents notified Epic SMU LLC of a transaction in which EIC Holding was going to "acquire 100% of the outstanding capital securities" of St. Matthew's University, Inc. at a price of $524.56 per share.

79.    On or about August 28, 2007, Epic SMU LLC received a Notice of Offer, again stating that Equinox SMU Partners LLC had agreed to sell all of its shares of common stock in St. Matthew's University, Inc. to EIC Holding (or one of its subsidiaries) at a price of $524.56 per share. Included with the Notice of Offer was a letter from EIC Holding to Rodger (as co-chairman of the board of directors of St. Matthew's University, Inc.) describing the offer. Philip Thornton signed the enclosed letter from EIC Holding in his capacity as the chief financial officer of EIC Holding. At the time the Notice of Offer was sent to Puopolo, Mr. Thornton was working for EIC Holding, which Rodger controlled as a result of Rodger's position as Chairman and CEO of EIC Holding, the identical position that he held at St. Matthew's University, Inc.

21

80.    Thereafter, Epic SMU LLC received notice that a consolidation via a short-form merger between St. Matthew's University, Inc. and an entity called EIC SMU Acquisition Corp. (a subsidiary of EIC Holding created by Rodger for the purposes of the consolidation) had been effected on September 21, 2007 (the "SMU-SABA/MUA Consolidation").

81.    In effect, the SMU-SABA/MUA Consolidation was nothing more than a corporate reorganization – though accomplished through a textbook case of wrongful self-dealing. It was designed to misappropriate the vast majority of Puopolo's economic rights. Prior to the consolidation, Equinox owned and controlled, through various entities, all of the common stock of St. Matthew's University, Inc., and also owned and controlled, through various entities, all of common stock of EIC Holding (which already owned and controlled Saba University School of Medicine and Medical University of the Americas Ltd.). Further, the purported "investors" involved in the SMU-SABA/MUA Consolidation "invested" almost exactly the amount that they were returned upon the closing of the SMU-SABA/MUA Consolidation – i.e., the "investments" were merely part of Rodger's scheme to defraud Puopolo and the "investment" funds were effectively passed through the SMU-SABA/MUA Consolidation.

82.    As Equinox's ownership rights and control did not change as a result of the SMU-SABA/MUA Consolidation, the SMU-SABA/MUA Consolidation can only be understood as an effort to (i) to wrongfully terminate Puopolo's sharing percentage in the SMU Investment and the SABA/MUA Investment, (ii) to wrongfully terminate Puopolo's right to the management fee due to him pursuant to the November Contract, and (iii) to wrongfully terminate Epic SMU LLC's rights pursuant to warrants held by

22

Epic SMU LLC.  Indeed, the elimination of Puopolo (and a few other minority interests) was the only real change brought about by the SMU-SABA/MUA Consolidation. Equinox, under the control of Rodger, retained its ownership interests and control of St. Matthew's University, Inc., Saba University School of Medicine, and Medical University of the Americas Ltd.

83.    Accordingly, because the SMU-SABA/MUA Consolidation was nothing more than a corporate reorganization designed to wrongfully terminate Puopolo's economic rights in the SMU Investment and the SABA/MUA Investment, and, moreover, Equinox's economic interest in each remains materially unchanged except as to form, Puopolo's economic rights should be deemed to continue in the new, combined entity – EIC Holding – and he should be entitled to a sharing percentage of 12.5% of the carried interest in EIC Holding held by any Equinox-affiliated entity or person, as well as the continuation of the management fee.

The Partial Performance of the May and November Contracts

84.    Shortly after the November Contract was executed, Puopolo was made a member of the Board of Directors of St. Matthew's University, Inc.

85.    From May 12, 2005 through April 19, 2007 the defendants treated Puopolo as a member of Equinox Partners III and as an employee of Equinox Capital. Among other things, the defendants initially provided Puopolo with an office at Equinox Capital in Connecticut (though later he worked out of his own office in New York City) and continuously discussed possible investment opportunities with Puopolo.  Puopolo was held out as an employee of Equinox Capital and signed various documents that were sent to third-parties in that capacity, and with Rodger's knowledge and consent.

23

86.    At the closing of the SMU Investment, Equinox Capital and Equinox Partners III paid Epic Partners II a cash fee of $1 million.

87.    Before the close of the SMU Investment, Puopolo was made a member of the Equinox Partners III's investment committee.

88.    Puopolo has fully performed all of his obligations pursuant to the May and November Contracts, and has fully performed his obligations pursuant to the Operating Agreement and the Employment Agreement as those agreements were incorporated into the May and November Contracts.

89.    Puopolo brought the SMU Investment to defendants, and worked with defendants to successfully close that investment.

90.    From May 12, 2005 through April 19, 2007 Puopolo devoted all of his business efforts to the business of Equinox Capital and Equinox Partners III as required by the May Contract and the November Contract, subject to the minor exceptions permitted thereunder.

91.    While a member of Equinox Partners III and employed by Equinox Capital, Puopolo submitted to Rodger, as president of Equinox Capital and managing member of Equinox Partners III, for his consideration, all potential investment opportunities that Puopolo considered to be potentially desirable investment transactions for Equinox Partners III, including, without limitation, the SABA/MUA Investment in March 2006.

92.    While a member of Equinox Partners III and employed by Equinox Capital, Puopolo presented over fifty investment opportunities both within the for-profit education and training industry and outside of that industry to the defendants and

24

solicited at least fifty investment banking firms, business brokers, lawyers, other private equity firms and corporate executives to develop a flow of investment opportunities for Equinox.

93.    While a member of Equinox Partners III and employed by Equinox Capital, Puopolo apprised the Equinox entities of industry trends, developments and market intelligence within, among others, the for-profit education and training industry and graduate medical education.

94.    While a member of Equinox Partners III and employed by Equinox Capital, Puopolo regularly worked out of the offices of Equinox Capital and Equinox Partners III, until such time as he moved his operations to his own office in New York City.

95.    Soon after the November Contract was executed, Puopolo increased his capital commitment in Equinox Capital III, L.P. from $250,000 to $450,000, as required to satisfy his commitment in connection with becoming a member of Equinox Partners III and an employee of Equinox Capital.

Defendants Terminate Puopolo and Deny Him His
Benefits Due Pursuant to the May and November Contracts

96.    On April 19, 2007, Rodger verbally informed Puopolo that Puopolo was terminated as a member of Equinox Partners III and as an employee of Equinox Capital.

97.    Puopolo has never received a written "Cause Notice" or any other written or oral complaint related to any of the other items listed in the employment contract as justifying a for-cause termination.

98.    Rodger later confirmed to Puopolo that Puopolo was entitled to a sharing percentage with respect to certain Equinox deals, but the percentages stated by Rodger

25

were below the sharing percentages to which Puopolo was actually entitled. Rodger

informed Puopolo that he would receive a 12.5% sharing percentage only on the $4

million equity portion of the SMU Investment and that he would receive no part of the

carried interest to be received by any Equinox entity or the other members of Equinox

Partners III on the $19.5 million equity portion of the SMU Investment. Rodger further

informed Puopolo that Puopolo would receive no sharing percentage of the carried

interest on the SABA/MUA Investment and only a 5% sharing percentage of the carried

interest from the CNS Investment.

99.     By letter dated June 6, 2007 to Rodger and the other members of the St.

Matthew's University, Inc. Board of Directors, Puopolo, in his capacity as a member of

the Board of Directors of St. Matthew's University (the "SMU Board"), expressed his

concern and discomfort over the misappropriation of an SMU corporate opportunity and

the conflicts of interest inherent in Equinox's undertaking the SABA/MUA investment

because both Saba University School of Medicine and Medical University of the

Americas Ltd. were clear and direct competitors of St. Matthew's University, Inc., and in

fact were even engaged in litigation with St. Matthew's University, Inc. that was settled

as a result of the SABA/MUA Investment.

100.     On June 8, 2007, two days after Puopolo raised concerns regarding the

potential misappropriation of a business opportunity and conflict of interest inherent in

Equinox's acquisition of SABA/MUA, Rodger informed Puopolo that Puopolo had been

removed from the SMU Board, effective immediately. By letter dated June 15, 2007,

Puopolo requested written evidence of the legal implementation of such action and

26

further appealed to all of the members of the SMU Board to reverse such improper action, but never received a response.

101.    After the closing of the SMU Investment, Equinox Capital paid Epic Partners II 50% of the management fees paid by St. Matthew's University, Inc. to Equinox Capital, upon receipt of each periodic payment of such management fees. The payments made by Equinox Capital to Epic Partners II were in the amount of $25,732.00 each quarter for approximately six quarters. Epic Partners II has not been paid the entirety of the portion of the management fee due to it for the quarters ending September 30, 2007 and December 31, 2007. The management fee for the third quarter of 2007 was only paid through September 21, 2007, the date Equinox completed the consolidation of its SMU and SABA/MUA holdings. None of the management fee for the quarter ending December 31, 2007 has been paid. Puopolo anticipates that no further management fees will be forthcoming, despite the fact that they are due and owing or will become due and owing at the end of each upcoming quarter.

102.    Under the terms of the May Contract and the November Contract, and the relevant and applicable portions of the Operating Agreement and the Employment Agreement, Puopolo is due, and has been substantially denied, the following:

        a.  a 12.5% sharing percentage of the carried interest on all aspects of the
            SMU Investment that will ultimately flow to Equinox, including, but not
            limited to, any returns received by Equinox Capital, Equinox Partners III,
            the other members of Equinox Partners III, or any other entity organized
            or controlled by the defendants, and including, without limitation, 12.5%
            of the carried interest on all equity portions of the investment, including,

27

without limitation, the $4,000,000 and $19,500,000 portions of the investment;

b. a 12.5% sharing percentage of the carried interest on the proceeds from the SABA/MUA Investment that will ultimately flow to Equinox, including, but not limited to, any returns received by Equinox Capital, Equinox Partners III, the other members of Equinox Partners III, or any other entity organized or controlled by the defendants, and including, without limitation, 12.5% of the carried interest on all equity portions of the investment, including, without limitation, the $2,500,000 and $24,500,000 portions of the investment;

c. a 12.5% sharing percentage of the carried interest on the proceeds from the CNS Investment that will ultimately flow to Equinox, including, but not limited to, any returns received by Equinox Capital, Equinox Partners III, the other members of Equinox Partners III, or any other entity organized or controlled by the defendants, and including, without limitation, 12.5% of the carried interest on all equity portions of the investment; and

d. 50% of the all of the management fees paid by St. Matthew's University, Inc. or its successor entity, for the remainder of the quarter ending September 30, 2007 as well as for the quarter ending December 31, 2007 and any and all quarters thereafter for as long as Equinox holds its majority stake in St. Matthew's University.

103.    Additionally, because the SMU-SABA/MUA Consolidation was not an arms-length transaction, but instead merely a corporate reorganization that has not materially effected Equinox's control of the underlying entities or Equinox's economic returns in the transaction (other than by prejudicing the economic rights of Puopolo and entities he controls), Puopolo is also due the following:

   a.  a 12.5% sharing percentage of the carried interest on the proceeds from the SMU-SABA/MUA Consolidation that will ultimately flow to Equinox, Rodger, Equinox Capital, Equinox Partners III, the other members of Equinox Partners III, or any other entity organized or controlled by the defendants; and

   b.  50% of all of the management fees paid by EIC Holding to any Equinox-related entity or person, upon receipt of each periodic payment of such management fees from EIC Holding.

104.    The value of the sharing percentages due to Puopolo, once ultimately paid, is estimated to have a present value of at least $5,284,000.

105.    The value of the management fees due to Puopolo, once ultimately paid, is estimated to have a present value of at least $451,000.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment for Breach of Contract)

106.    Plaintiff repeats and realleges, with full force and validity, each and every allegation as set forth above in this Complaint as if set forth at length herein.

107.    The November Contract and the May Contract formed a valid and binding contract between Puopolo and Equinox Partners III and Equinox Capital.

29

108.    Defendants' structuring of the SMU Investment so as to deprive Puopolo of the bargained for benefits owed him was a breach of the November Contract and the May Contract.

109.    Rodger, Equinox Capital and Equinox Partners III's stated intention not to pay Puopolo the 12.5% sharing percentage of the carried interest due to him in connection with the entire SMU Investment, the entire CNS Investment, the entire SABA/MUA Investment, and the entire SMU-SABA/MUA Consolidation, pursuant to the terms of the November Contract and the May Contract, constitutes a breach or an anticipatory breach of contract.

110.    Rodger, Equinox Capital and Equinox Partners III's failure to pay Puopolo 50% of all of the management fees paid by St. Matthew's University, Inc., or its successor entity, for the remainder of the quarter ending September 30, 2007 as well as for the quarter ending December 31, 2007 and any and all quarters thereafter for as long as Equinox holds its majority stake in St. Matthew's University, pursuant to the terms of the November Contract and the May Contract, constitutes a breach or an anticipatory breach of contract.

111.    By reason of the foregoing breach and anticipatory breach, plaintiff demands a declaration (i) that pursuant to the November Contract and the May Contract he is entitled to a sharing percentage of 12.5% of the carried interest due to him in connection with the entire SMU Investment, the entire CNS Investment, the entire SABA/MUA Investment, and the entire SMU-SABA/MUA Consolidation; and (ii) that pursuant to the November Contract and the May Contract he is entitled to receive 50% of all of the management fees paid by St. Matthew's University, Inc., or its successor entity,

30

for the remainder of the quarter ending September 30, 2007 as well as for the quarter

ending December 31, 2007 and any and all quarters thereafter for as long as Equinox

holds its majority stake in St. Matthew's University.

### SECOND CAUSE OF ACTION
**(Damages for Breach of Contract)**

112.    Plaintiff repeats and realleges, with full force and validity, each and every

allegation as set forth above in this Complaint as if set forth at length herein.

113.    The November Contract and the May Contract formed a valid and binding

contract between Puopolo and Equinox Partners III and Equinox Capital.

114.    Defendants' structuring of the SMU Investment so as to deprive Puopolo

of the bargained for benefits owed him was a breach of the November Contract and the

May Contract.

115.    Rodger, Equinox Capital and Equinox Partners III's stated intention not to

pay Puopolo the 12.5% sharing percentage of the carried interest due to him in

connection with the entire SMU Investment, the entire CNS Investment, the entire

SABA/MUA Investment, and the entire SMU-SABA/MUA Consolidation, pursuant to

the terms of the November Contract and the May Contract, constitutes a breach or an

anticipatory breach of contract.

116.    Rodger, Equinox Capital and Equinox Partners III's failure to pay Puopolo

50% of all of the management fees paid by St. Matthew's University, Inc., or its

successor entity, for the remainder of the quarter ending September 30, 2007 as well as

for the quarter ending December 31, 2007 and any and all quarters thereafter for as long

as Equinox holds its majority stake in St. Matthew's University, pursuant to the terms of

the November Contract and the May Contract, constitutes a breach or an anticipatory
breach of contract.

117.    By reason of the foregoing breach and anticipatory breach, Puopolo has
been damaged by being denied certain benefits due him, in an amount to be determined at
trial, but believed to be not less than $5,735,000.

### THIRD CAUSE OF ACTION
### (Declaratory Judgment for Breach of Fiduciary Duty)

118.    Plaintiff repeats and realleges, with full force and validity, each and every
allegation as set forth above in this Complaint as if set forth at length herein.

119.    Rodger, as a member and the controlling person of Equinox Partners III,
owed Puopolo fiduciary duties while Puopolo was a member of Equinox Partners III.

120.    Defendants' structuring of the SMU Investment, under Rodger's direction,
so as to deprive Puopolo of the bargained for benefits owed him was a breach of
Rodger's duties.

121.    Rodger, Equinox Capital and Equinox Partners III's stated intention not to
pay Puopolo the 12.5% sharing percentage of the carried interest due to him in
connection with the entire SMU Investment, the entire CNS Investment, the entire
SABA/MUA Investment, and the entire SMU-SABA/MUA Consolidation, pursuant to
the terms of the November Contract and the May Contract, constitutes a breach or an
anticipatory breach of Rodger's fiduciary duties.

122.    Rodger, Equinox Capital and Equinox Partners III's failure to pay Puopolo
50% of all of the management fees paid by St. Matthew's University, Inc., or its
successor entity, for the remainder of the quarter ending September 30, 2007 as well as
for the quarter ending December 31, 2007 and any and all quarters thereafter for as long

32

as Equinox holds its majority stake in St. Matthew's University, pursuant to the terms of the November Contract and the May Contract, constitutes a breach or an anticipatory breach of Rodger's fiduciary duties.

123.   By reason of the foregoing breach and anticipatory breach, plaintiff demands a declaration (i) that Rodger is in breach of his fiduciary duties, (ii) that plaintiff is entitled to a sharing percentage of 12.5% of the carried interest due to him in connection with the entire SMU Investment, the entire CNS Investment, the entire SABA/MUA Investment, and the entire SMU-SABA/MUA Consolidation, and (iii) that he is entitled to receive 50% of all of the management fees paid by St. Matthew's University, Inc., or its successor entity, for the remainder of the quarter ending September 30, 2007 as well as for the quarter ending December 31, 2007 and any and all quarters thereafter for as long as Equinox holds its majority stake in St. Matthew's University.

### FOURTH CAUSE OF ACTION
**(Damages for Breach of Fiduciary Duty)**

124.   Plaintiff repeats and realleges, with full force and validity, each and every allegation as set forth above in this Complaint as if set forth at length herein.

125.   Rodger, as the controlling person at Equinox Partners III, owed Puopolo fiduciary duties while he was a member of Equinox Partners III.

126.   Defendants' structuring of the SMU Investment so as to deprive Puopolo of the bargained for benefits owed him was a breach of Rodger's duties.

127.   Rodger, Equinox Capital and Equinox Partners III's stated intention not to pay Puopolo the 12.5% sharing percentage of the carried interest due to him in connection with the entire SMU Investment, the entire CNS Investment, the entire SABA/MUA Investment, and the entire SMU-SABA/MUA Consolidation, pursuant to

33

the terms of the November Contract and the May Contract, constitutes a breach or an anticipatory breach of Rodger's fiduciary duties.

128.    Rodger, Equinox Capital and Equinox Partners III's failure to pay Puopolo 50% of all of the management fees paid by St. Matthew's University, Inc., or its successor entity, for the remainder of the quarter ending September 30, 2007 as well as for the quarter ending December 31, 2007 and any and all quarters thereafter for as long as Equinox holds its majority stake in St. Matthew's University, pursuant to the terms of the November Contract and the May Contract, constitutes a breach or an anticipatory breach of Rodger's fiduciary duties.

129.    By reason of the foregoing breach and anticipatory breach, Puopolo has been damaged by being denied certain benefits due him, in an amount to be determined at trial, but believed to be not less than $5,735,000.

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment for Breach of Duty of Good Faith and Fair Dealing)

130.    Plaintiff repeats and realleges, with full force and validity, each and every allegation as set forth above in this Complaint as if set forth at length herein.

131.    Implied in every contract is a duty of good faith and fair dealing.

132.    Defendants' structuring of the SMU Investment so as to deprive Puopolo of the bargained for benefits owed him was a breach of this covenant of good faith and fair dealing.

133.    Defendants' denying Puopolo his full participation in deals due him upon a termination without cause constitutes a breach of defendants' duties.

134.    Equinox Capital and Equinox Partners III's stated intention not to pay Puopolo the 12.5% sharing percentage of the carried interest due to him in connection

with the entire SMU Investment, the entire CNS Investment, the entire SABA/MUA

Investment, and the entire SMU-SABA/MUA Consolidation, pursuant to the terms of the

November Contract and the May Contract, constitutes a breach or an anticipatory breach

of the covenant of good faith and fair dealing.

135.    Rodger, Equinox Capital and Equinox Partners III's failure to pay Puopolo

50% of all of the management fees paid by St. Matthew's University, Inc., or its

successor entity, for the remainder of the quarter ending September 30, 2007 as well as

for the quarter ending December 31, 2007 and any and all quarters thereafter for as long

as Equinox holds its majority stake in St. Matthew's University, pursuant to the terms of

the November Contract and the May Contract, constitutes a breach or an anticipatory

breach of the covenant of good faith and fair dealing.

136.    Defendants' structuring of the SMU-SABA/MUA Consolidation to (i)

attempt to prematurely terminate Puopolo's sharing percentage in the SMU Investment

and the SABA/MUA Investment, (ii) attempt to prematurely terminate Puopolo's right to

the management fee due to him pursuant to the May and November Contracts, and (iii)

attempt to prematurely terminate Epic SMU LLC's rights pursuant to its warrants, was a

breach of this covenant of good faith and fair dealing.

137.    By reason of the foregoing breach and anticipatory breach, plaintiff

demands a declaration (i) that the defendants are in breach of the duty of good faith and

fair dealing, (ii) that plaintiff is entitled to a sharing percentage of 12.5% of the carried

interest due to him in connection with the entire SMU Investment, the entire CNS

Investment, the entire SABA/MUA Investment, and the entire SMU-SABA/MUA

Consolidation, and (iii) that he is entitled to receive 50% of all of the management fees

35

paid by St. Matthew's University, Inc., or its successor entity, for the remainder of the

quarter ending September 30, 2007 as well as for the quarter ending December 31, 2007

and any and all quarters thereafter for as long as Equinox holds its majority stake in St.

Matthew's University.

### SIXTH CAUSE OF ACTION
**(Damages for Breach of Duty of Good Faith and Fair Dealing)**

138.    Plaintiff repeats and realleges, with full force and validity, each and every

allegation as set forth above in this Complaint as if set forth at length herein.

139.    Implied in every contract is a duty of good faith and fair dealing.

140.    Defendants' structuring of the SMU Investment so as to deprive Puopolo

of the bargained for benefits owed him was a breach of this covenant of good faith and

fair dealing.

141.    Defendants' denying Puopolo his full participation in deals due him upon

a termination without cause constitutes a breach of defendants' duties.

142.    Equinox Capital and Equinox Partners III's stated intention not to pay

Puopolo the 12.5% sharing percentage of the carried interest due to him in connection

with the entire SMU Investment, the entire CNS Investment, the entire SABA/MUA

Investment, and the entire SMU-SABA/MUA Consolidation, pursuant to the terms of the

November Contract and the May Contract, constitutes a continuing breach of the

covenant of good faith and fair dealing.

143.    Rodger, Equinox Capital and Equinox Partners III's failure to pay Puopolo

50% of all of the management fees paid by St. Matthew's University, Inc., or its

successor entity, for the remainder of the quarter ending September 30, 2007 as well as

for the quarter ending December 31, 2007 and any and all quarters thereafter for as long

36

as Equinox holds its majority stake in St. Matthew's University, pursuant to the terms of the November Contract and the May Contract, constitutes a breach or an anticipatory breach of the covenant of good faith and fair dealing.

144.    Defendants' structuring of the SMU-SABA/MUA Consolidation to (i) attempt to prematurely terminate Puopolo's sharing percentage in the SMU Investment and the SABA/MUA Investment, (ii) attempt to prematurely terminate Puopolo's right to the management fee due to him pursuant to the May and November Contracts, and (iii) attempt to prematurely terminate Epic SMU LLC's rights pursuant to its warrants, was a breach of this covenant of good faith and fair dealing.

145.    By reason of the foregoing breach and anticipatory breach, Puopolo has been damaged by being denied certain benefits due him, in an amount to be determined at trial, but believed to be not less than $5,735,000.

*WHEREFORE* the plaintiff demands judgment against the defendants as follows:

        a.  A declaration (i) that pursuant to the November Contract and the May Contract plaintiff is entitled to a sharing percentage of 12.5% of the carried interest due to him in connection with the entire SMU Investment, the entire CNS Investment, the entire SABA/MUA Investment, and the entire SMU-SABA/MUA Investment, (ii) that plaintiff is entitled to receive 50% of all of the management fees paid by St. Matthew's University, Inc., or its successor entity, for the remainder of the quarter ending September 30, 2007 as well as for the quarter ending December 31, 2007 and any and all quarters thereafter for as long as Equinox holds its

majority stake in St. Matthew's University, (iii) that plaintiff is entitled to a 12.5% sharing percentage of the carried interest on the proceeds from the SMU-SABA/MUA Consolidation that will ultimately flow to Rodger, Equinox Capital, Equinox Partners III, the other members of Equinox Partners III, or any other entity organized or controlled by the defendants, and (iv) that plaintiff is entitled to 50% of all of the management fees paid by EIC Holding to Rodger, Equinox Capital, Equinox Partners III, the other members of Equinox Partners III, or any other entity organized or controlled by the defendants, upon receipt of each periodic payment of such management fees from EIC Holding.

b.  As against all defendants, jointly and severally, money damages in an amount to be determined at trial, but estimated to be at least $5,735,000.

c.  As against all defendants, jointly and severally, interest, costs, and attorneys' fees, to the extent permitted by law, and such other and further relief as the court deems just and proper.

Dated:      New York, New York
            January 29, 2008            EISEMAN LEVINE LEHRHAUPT
                                         & KAKOYIANNIS, P.C.


                                         By:  _____
                                             Eric P. Heichel
                                             Eiseman Levine Lehrhaupt
                                              & Kakoyiannis, P.C.
                                             805 Third Avenue
                                             New York, NY 10022
                                             212-752-1000
                                             *Attorneys for Plaintiff*

Of Counsel:
Jeffrey A. Fromm
Jonathan C. Marquet



May 12, 2005

Robert T. Puopolo
Epic Partners II, LLC
116 West 23rd Street, 5th Floor
New York, NY 10011

Dear Bob:

Following our preliminary review of the information regarding St. Matthew's University (Cayman), Ltd., St. Matthew's Cayman International, Ltd. Co., St. Matthew's University School of Medicine Limited and St. Matthew's International, Ltd. Co. (collectively, with all other related subsidiaries, affiliates and assets, but excluding St. Matthew's University Facilities, Ltd. and St. Matthew's Auxiliary Services, Ltd., the "Company" or "St. Matthew's University"), Equinox Capital, Inc. ("Equinox") is pleased to present you with the following: (i) proposed arrangement between Epic Partners II, LLC ("Epic Partners") and Equinox for the acquisition of the Company; (ii) offer of partnership in Equinox Partners III, LLC to Robert T. Puopolo; and (iii) offer of employment by Equinox Capital, Inc. to Robert T. Puopolo, on the terms and conditions outlined below.

This proposal does not contain or specify all of the terms and conditions of the arrangements contemplated herein. All such arrangements shall be governed by contractual undertaking(s) to be negotiated in good faith and which will contain terms and conditions that are mutually satisfactory in good faith to Equinox, Robert T. Puopolo and Epic Partners, as applicable.

We are extremely excited about the prospect of working with you on this transaction and our impending partnership. We have attempted to structure the following proposal to reflect our prior negotiated terms.

### Proposed Arrangement Among Equinox,
### Robert T. Puopolo And Epic Partners For The LBO/Recapitalization
### Of St. Matthew's University

1. Assignment of Rights:
In consideration of the provisions of this letter agreement, Epic Partners will irrevocably assign its rights under that certain letter agreement dated April 22, 2005 between the Company and Epic Partners.

2. Board:
Equinox will appoint Robert T. Puopolo to the Company's Board of Directors. Mr. Puopolo will serve as the Company's Chairman until such time as Equinox designates another party to serve in such capacity. Equinox will seek to elect Mr. Kameron Rabenou to the Company's Board of Directors so long as Mr. Rabenou's election does not bring Equinox's representation on the Company's Board of Directors below a supermajority (such supermajority to include Mr. Puopolo). In the event that Mr. Rabenou is not elected to the Company's Board of Directors, he will be granted observer rights.

3. Epic's Role:
Subject to Equinox's constraints and desires, Epic Partners will assist in structuring, negotiating, and financing the transaction.

4. Transaction Fees:
Epic Partners to receive a cash fee equal to $1 million at the closing.

5. Equity:
Epic Partners to receive fully-vested ten-year options to purchase an initial 14% interest in the Company's equity securities at an exercise price equal to the price paid in the transaction plus a premium of 10%. Such options will be subject to dilution by any equity-related securities issued to third party providers of debt and/or members of the Company's management.

In the event that the transaction requires in excess of $16 million but less than $20 million of equity or equity-related capital to close, Epic Partners' interest in the Company's equity securities shall be determined in the following manner: 14% less the product of (i) 2.5% times (ii) the quotient of (x) the amount of

595795_1

capital in excess of $16 million and (y) $4 million.

In the event that the transaction requires in excess of $20 million of equity or equity-related capital, Epic Partners' interest in the Company's equity securities will be 11.5%.

| | |
|---|---|
| 6. Management Fees: | Robert T. Puopolo or Epic Partners, at Mr. Puopolo's sole discretion, to be paid 50% of any management fees received by Equinox from the Company in connection with the initial acquisition. Such payment will be made in a timely matter after receipt by Equinox. |
| 7. Co-Investment: | The members or consultants of Epic Partners may invest up to $750,000 on terms equivalent to those of Equinox. |
| 8. Shareholders' Agreement: | In connection with receiving options and/or coinvesting in this transaction, Epic Partners and/or the members and/or consultants who coinvest will enter into a shareholders' agreement which will provide that such persons agree (i) to waive any and all dissenters' rights, (ii) give Equinox their irrevocable proxy and/or agree to vote in a manner as designated by Equinox, and (iii) agree to drag along provisions. |

Additionally, Epic Partners' investors will be granted: (i) tag along rights, (ii) piggy-back rights, and (iii) one demand registration right if the Company has previously been taken public in a qualifying initial public offering.

593798_1

### Proposed Arrangement Among Equinox, Robert T. Puopolo And Equinox Partners III, LLC

| | |
|---|---|
| 1. Carried Interest: | Robert T. Puopolo shall receive a Sharing Percentage of 5%, as that term is defined in the Amended and Restated Operating Agreement of Equinox Partners III, LLC (the EP III Agreement"), in Equinox Partners III, LLC ("EP III") for the current investment year as well as 2004. |
| | Mr. Puopolo's Sharing Percentage will be subject to the terms and conditions of the EP III Agreement. Prior to receiving this Sharing Percentage, Robert T. Puopolo will become a party to and agree to be bound by the terms of the EP III Agreement as well as enter into an Employment Agreement with Equinox. |
| | In the event that the acquisition of St. Matthew's University is consummated and Equinox Capital III, L.P. makes an investment in such transaction, then Robert T. Puopolo's Sharing Percentage in EP III will be increased to 12.5%. |
| 2. Status: | Until such time as Mr. Puopolo is able to become a full-time partner, Mr. Puopolo will be a part-time partner. At such time as Mr. Puopolo desires to become a full-time partner, Equinox and EP III will reevaluate its arrangements with Mr. Puopolo, including the Sharing Percentage. |
| 3. Title: | Mr. Puopolo will have the same title as Mark Durfee and John Wechsler in Equinox. |
| 4. Obligations/Non-Compete: | As outlined in various documents, as a condition to Mr. Puopolo's receiving a Sharing Percentage in EP III, Mr. Puopolo will be obligated to devote his entire business efforts to the business of Equinox and EP III. This obligation, however, will not prevent or interfere with Mr. Puopolo's ability to perform his duties to Corporate Training Holdings, Inc. ("NCTI"), Met Schools, Inc., Helma Institute LLC, Oasis Children's Services LLC and Sint Eustatius Management Corp. ("Statia"). Equinox acknowledges that Mr. Puopolo, through an affiliate of Epic Partners, has an indirect equity interest in Statia, the parent company of the University of Sint Eustatius School of |

585798_1

Equinox Capital, Inc.
Page 5 of 5

Medicine and a competitor to St. Matthews. To the extent that
EP III makes an investment in St. Matthews, then Mr. Puopolo
will not provide any services to Statia.

5. Additional
   Subscription:

Mr. Puopolo will make an additional subscription as a limited
partner in Equinox Capital III, L.P. of $200,000.

6. Investment
   Committee:

Mr. Puopolo will become a member of Equinox Partners III,
LLC's investment committee.

* * *

If you are in agreement with the terms and conditions outlined above, please indicate your
acceptance by signing below and returning an executed copy. Upon your signature, we agree that the
terms of this letter agreement will be binding.

A signature below will also authorize the assignment of any and all rights under the letter
agreement dated April 22, 2005 between Epic Partners and the Company to Equinox.

Sincerely,

Steven C. Rodger

Accepted and agreed to:

**EPIC PARTNERS II, LLC**

By:
Name: Robert T. Puopolo
Title: Managing Member

By:
Name: Robert T. Puopolo

595798_1



November 23, 2005

Robert T. Puopolo
Epic SMU LLC
Epic Partners II, LLC
116 West 23rd Street, 5th Floor
New York, NY 10011

Dear Bob:

Reference is made to that certain letter dated May 12, 2005 (the "Letter"), among Robert T. Puopolo, Epic Partners II, LLC ("Epic Partners") and Equinox Capital, Inc. ("Equinox"). The purpose of this letter is to amend those arrangements, as outlined in the Letter, and to confirm our arrangements going forward. All such arrangements in the Letter are hereby amended and replaced by those outlined herein.

Following our review of the information regarding St. Matthew's University (Cayman), Ltd., St. Matthew's Cayman International, Ltd. Co., St. Matthew's University School of Medicine Limited and St. Matthew's International, Ltd. Co. (collectively, with all other related subsidiaries, affiliates and assets, but excluding St. Matthew's University Facilities, Ltd. and St. Matthew's Auxiliary Services, Ltd., the "Company" or "St. Matthew's University"), Equinox is pleased to present you with the following: (i) proposed arrangement between Epic Partners, Epic SMU LLC ("Epic SMU") and Equinox for the acquisition of the Company; (ii) offer of partnership in Equinox Partners III, LLC to Robert T. Puopolo; and (iii) offer of employment by Equinox Capital, Inc. to Robert T. Puopolo, on the terms and conditions outlined below.

This proposal does not contain or specify all of the terms and conditions of the arrangements contemplated herein. All such arrangements shall be governed by contractual undertaking(s) to be negotiated in good faith and which will contain terms and conditions that are mutually satisfactory in good faith to Equinox, Robert T. Puopolo, Epic SMU and Epic Partners, as applicable.

We are extremely excited about the prospect of working with you on this transaction and our impending partnership. We have attempted to structure the following proposal to reflect our prior negotiated terms.

### Proposed Arrangement Among Equinox,
*Robert T. Puopolo, Epic SMU And Epic Partners For The LBO/Recapitalization*
*Of St. Matthew's University*

| | |
|---|---|
| 1. Assignment of Rights: | In consideration of the provisions of the Letter, Epic Partners irrevocably assigned its rights under that certain letter agreement dated April 22, 2005 between the Company and Epic Partners. |
| 2. Board: | Equinox will appoint Robert T. Puopolo to the Company's Board of Directors. |
| 3. Epic's Role: | Subject to Equinox's constraints and desires, Epic Partners will assist in structuring, negotiating, and financing the transaction. |
| 4. Transaction Fees: | Epic Partners to receive a cash fee equal to $1 million at the closing. |
| 5. Equity: | Epic SMU to purchase for $1,000 fully-vested ten-year warrants to purchase (i) an initial 7% interest in the Company's equity securities at an exercise price equal to the price paid in the transaction plus a premium of 10%, and (ii) an additional 2.5% interest in the Company's equity securities at an exercise price equal to the price paid in the transaction plus a premium of 200%. Such warrants will be subject to dilution by any equity-related securities issued to third party providers of debt and/or members of the Company's management. |
| 6. Management Fees: | Robert T. Puopolo or Epic Partners, at Mr. Puopolo's sole discretion, to be paid 50% of any management fees received by Equinox from the Company in connection with the initial acquisition. Such payment will be made in a timely matter after receipt by Equinox. |
| 7. Shareholders' Agreement: | In connection with receiving warrants in this transaction, Epic SMU and/or its members will enter into a shareholders' agreement which will provide that such persons agree (i) to waive any and all dissenters' rights, (ii) give Equinox their irrevocable proxy and/or agree to vote in a manner as designated by Equinox, and (iii) agree to drag* along provisions. Additionally, Epic SMU and/or its members will be granted: (i) tag along rights, (ii) piggy-back rights, and (iii) one demand registration right if the Company has previously been taken public in a qualifying initial public offering. |

*Proposed Arrangement Among Equinox,*
*Robert T. Puopolo, Epic SMU  And Equinox Partners III, LLC*

1. Carried Interest:

Robert T. Puopolo shall receive a Sharing Percentage of 5%, as that term is defined in the Amended and Restated Operating Agreement of Equinox Partners III, LLC (the "EP III Agreement"), in Equinox Partners III, LLC ("EP III") for the current investment year as well as 2004.

Mr. Puopolo's Sharing Percentage will be subject to the terms and conditions of the EP III Agreement. Prior to receiving this Sharing Percentage, Robert T. Puopolo will become a party to and agree to be bound by the terms of the EP III Agreement as well as enter into an Employment Agreement with Equinox.

In the event that the acquisition of St. Matthew's University is consummated and Equinox Capital III, L.P. makes an investment in such transaction, then Robert T. Puopolo's Sharing Percentage in EP III will be increased to 12.5%.

2. Status:

Until such time as Mr. Puopolo is able to become a full-time partner, Mr. Puopolo will be a part-time partner. At such time as Mr. Puopolo desires to become a full-time partner, Equinox and EP III will reevaluate its arrangements with Mr. Puopolo, including the Sharing Percentage.

3. Title:

Mr. Puopolo will have the same title as Mark Durfee and John Wechsler in Equinox.

4. Obligations/Non-Compete:

As outlined in various documents, as a condition to Mr. Puopolo's receiving a Sharing Percentage in EP III, Mr. Puopolo will be obligated to devote his entire business efforts to the business of Equinox and EP III. This obligation, however, will not prevent or interfere with Mr. Puopolo's ability to perform his duties to Corporate Training Holdings, Inc. ("NCTI"), Met Schools, Inc., Helma Institute LLC, Oasis Children's Services LLC and Sint Eustatius Management Corp. ("Statia"). Equinox acknowledges that Mr. Puopolo, through an affiliate of Epic Partners, has an indirect equity interest in Statia, the parent company of the University of Sint Eustatius School of Medicine and a competitor to St. Matthews. To the extent that EP III makes an investment in St. Matthews, then Mr. Puopolo will not provide any services to Statia.

5. Additional Subscription:

In consideration for the terms contained in the Letter, irrespective of whether or not the transactions contemplated herein with St. Matthew's University occur, Mr. Puopolo has

595798_1

Equinox Capital, Inc.
Page 4 of 5

committed to an additional subscription as a limited partner in
Equinox Capital III, L.P. of $200,000.

| | |
|---|---|
| 6. Investment Committee: | Mr. Puopolo will become a member of Equinox Partners III, LLC's investment committee. |

\* \* \*

If you are in agreement with the terms and conditions outlined above, please indicate your
acceptance by signing below and returning an executed copy. Upon your signature, we agree that the
terms of this letter agreement will be binding.

A signature below will also serve to amend any and all terms under the Letter agreement dated
May 12, 2005 among Robert T. Puopolo, Epic Partners and Equinox with the terms outlined herein.

Sincerely,

Steven C. Rodger

Accepted and agreed to:

**EPIC PARTNERS II, LLC**

By: _Robert T. Puopolo_
Name: Robert T. Puopolo
Title: Managing Member

By: _Robert T. Puopolo_
Name: Robert T. Puopolo

**EPIC SMU LLC**

By: _Robert T. Puopolo_
Name: Robert T. Puopolo
Title: Managing Member

595798_1

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

EQUINOX PARTNERS III, LLC

a Delaware Limited Liability Company

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

EQUINOX PARTNERS III, LLC

A DELAWARE LIMITED LIABILITY COMPANY

THIS AMENDED AND RESTATED OPERATING AGREEMENT is made and entered into as of the 15th day of December, 2004, by and among the individuals set forth on Exhibit A attached hereto and those parties who from time to time execute this Agreement or counterparts hereof as Members.

## INTRODUCTION

The parties are the Members of **EQUINOX PARTNERS III, LLC**, a Delaware limited liability company (the "Company"). This Amended and Restated Operating Agreement amends and restates that certain Operating Agreement of the Company dated as of March 1, 2004, as amended by Addendum No. 1 dated March 15, 2004, sets forth certain rights and obligations of its Members and the terms and conditions pursuant to which the Company will be governed.

## TERMS AND CONDITIONS

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meaning and significance indicated below:

"**Act**" means the Delaware Limited Liability Company Act, as amended from time to time.

"**Agreement**" means this Amended and Restated Operating Agreement, as it may be amended, modified or supplemented from time to time.

"**Assets**" shall mean and include common and preferred stock (including warrants, rights and other options relating thereto or any combination thereof), notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, and other properties or interests commonly regarded as securities, and in addition, interests in real property, whether improved or unimproved, and interests in personal property of all kinds, tangible or intangible, choses in action, and cash, bank deposits and so-called "money market instruments".

"**Assets Under Management**" shall mean, as of any specified date, the value of all Assets owned by the Partnership (such value to be determined as provided in the Agreement), including contributions requested and due from Partners and uncalled amounts of Commitments

1

less the amount of any liabilities of the Partnership determined in accordance with generally accepted accounting principles.

"**Capital Account**" means with respect to each Member the account maintained in accordance with Article 6 of this Agreement.

"**Capital Contributions**" means the total amount of money or fair market value of property contributed to the Company by a Member and as such term is further described in Section 6.1(a) hereof.

"**Clawback Amount**" has the meaning given such term in Section 6.1(b) hereof.

"**Code**" means the Internal Revenue Code of 1986, and any amendments or modifications thereof.

"**Commitments**" shall mean the capital contributions to the Partnership which the Partners have made or are obligated to make to the Partnership.

"**Company**" means EQUINOX PARTNERS III, LLC, a Delaware limited liability company.

"**Company Year**" means a calendar year.

"**Deficit Limitation**" means the dollar amount of any deficit balance in a Member's Capital Account as of the end of any fiscal year of the Company, which deficit such Member is obligated to restore within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(c), increased by the amount described under Treasury Regulation Section 1.704-2(g)(1) relating to the Member's Share of Minimum Gain (as that term is hereinafter defined) and by the amount described in Section 9.3 of this Agreement relating to a nonrecourse loan by a Member, and decreased by the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Employment Agreements**" has the meaning given such term in Article 17 of this Agreement.

"**General Partner**" shall mean the general partner or general partners of the Partnership.

"**Investment**" shall mean any investment of the Partnership (and indirectly the SBIC Partnership) in the securities (debt and/or equity) of a Portfolio Company.

"**Investment Advisor/Manager**" shall mean the Manager.

"**Investment Committee**" means the committee described in Article 13 hereof.

"**Investment Committee Chairman**" shall have the mean given such term in Section 13.1 hereof.

"**Limited Partners**" shall mean any limited partners of the Partnership.

2

"**Manager**" means Equinox Capital, Inc., a Delaware corporation.

"**Management Fee**" means the management fee paid to the Company by the Partnership pursuant to the Partnership Agreement.

"**Majority in Interest**" shall mean Members holding more than seventy-five percent (75%) of the Sharing Percentages set forth on Exhibit C to this Agreement.

"**Member**" means the individuals set forth on Exhibit A attached hereto and any other party who may hereafter become a Member or a Substitute Member.

"**Member's Share of Minimum Gain**" means at the end of any fiscal year of the Company (i) the total of the Nonrecourse Deductions allocated to that Member up to that time and the distributions made to that Member up to that time of proceeds of a nonrecourse liability allocable to an increase in the Minimum Gain of the Company, reduced by (ii) that Member's share of the total net decrease in Minimum Gain, all as described in Treasury Regulation Section 1.704-2(g). A Member's Share of the net decrease in Minimum Gain for any fiscal year is the amount of the total net decrease in Minimum Gain of the Company for that year as multiplied by the Member's percentage share of the Minimum Gain of the Company at the end of the immediately preceding fiscal year as described in Treasury Regulation Section 1.704-2(g)(2).

"**Membership Interest**" means with respect to each Member such Member's entire ownership interest in the Company, including its interest in the property, profits, gains and distributions of the Company as described in this Agreement and all other rights and obligations with respect to the Company under this Agreement, the Act or otherwise. *Unless otherwise specified, each Member's Membership Interest shall equal such Member's Sharing Percentage.*

"**Minimum Gain**" means the gain that would be realized by the Company if any property subject to a nonrecourse debt were disposed of in full satisfaction of such debt on the relevant date. Such amount shall be computed separately for each nonrecourse liability of the Company and then aggregated. A "nonrecourse debt or liability" of the Company is one for which no Member or related person bears the economic risk of loss in accordance with Treasury Regulation Section 1.752-2. The net increase or decrease in Minimum Gain for any fiscal year shall be determined by comparing the Minimum gain on the last day of the immediately preceding fiscal year with the Minimum Gain of the Company on the last day of the current fiscal year.

"**Net Profit or Net Loss**" of the Company means the net profit or loss of the Company for each fiscal year of the Company determined in accordance with the principles applied in determining income, gains, expenses, deductions or losses, as the case may be, reported by the Company for federal income tax purposes. Such Net Profit or Net Loss shall take into account the Net Profit or Net Loss allocated to the Company.

"**Net Receipts**" means all cash and non-cash receipts of the Company other than (a) funded Capital Contributions; and (b) proceeds of indebtedness.

3

"**Nonrecourse Deductions**" means the net increase, if any, in the amount of the Minimum Gain during the fiscal year of the Company reduced (but not below zero) by the aggregate amount of any distributions during the year of proceeds of nonrecourse liability that are allocable to an increase in Minimum Gain as determined under Treasury Regulation Section 1.705-2(c). Nonrecourse Deductions shall consist first of depreciation or cost recovery deductions with respect to any property of the Company giving rise to the increase in Minimum Gain to the extent of such increase with any excess made up pro rata of all other items of deduction.

"**Ownership Change**" means, with respect to any partnership, corporation, firm or other entity which is a Member of the Company, any transfer, sale or assignment, by operation of law or otherwise, of any interest in such entity that would result in an equity ownership change in such entity of fifty percent (50%) or more, or in a change in the voting control of such entity, compared to the equity ownership or voting control of such entity upon the date of its admission to the Company as a Member.

"**Partners**" shall mean the General Partner and the Limited Partners of the Partnership.

"**Partnership**" means Equinox Capital III, L.P., a Delaware limited partnership.

"**Partnership Agreement**" shall mean the Equinox Capital III, L.P. Agreement of Limited Partnership dated and effective as of April 1, 2004. A copy of the Partnership Agreement is attached as Exhibit B.

"**Portfolio Company**" means a person whose securities have been acquired, in whole or in part, indirectly by the Company through the Partnership.

"**Profits**" means any dividends, interest, gain upon sale or other distribution or other income derived from an Investment.

"**SBIC Partnership**" means Equinox Capital III SBIC, L.P., a Delaware limited partnership.

"**Securities or Security**" means and includes common and preferred or preference stock and interests therein (including warrants, rights, put and call options and other options relating thereto, or convertible or exchangeable stock or debt, or any combination thereof), whether or not registered under the Securities Act of 1933, as amended, general and limited partnership interests, certificates of interest or participation in any profit sharing agreements, tax sharing or registration rights agreements, voting trust or other certificates, investment contracts, notes, bonds, debentures, trust receipts, mortgages, deeds of trust and other obligations, instruments or evidence of indebtedness and all combinations thereof, whether or not registered under the Securities Act of 1933, as amended, certificates, receipts and other instruments representing rights to receive, purchase, sell or subscribe for any of the foregoing or representing any other rights or interest therein and any and all property or evidences of ownership of property (real or personal, tangible or intangible) or interests not included above which are or may hereafter be commonly regarded as securities and any property (or rights therein) which is distributed in respect of the ownership of a Security.

4

"**Sharing Percentages**" shall mean the percentage interests of the Members set forth on Exhibit C, as it may be amended from time to time to reflect annual allocation of Sharing Percentage in accordance with Section 6.5 of this Agreement.

"**Substitute Member**" means any person or entity who or which is admitted to the Company as a Substitute Member pursuant to Article 15.4 of this Agreement.

"**Terminated Member**" shall have the meaning set forth in Article 17 of this Agreement.

"**Treasury Regulation**" means the Treasury Regulations adopted from time to time by the United States Treasury Department pursuant to the Internal Revenue Code of 1986, as amended.

"**Waived Fee Amount**" has the meaning provided in the Partnership Agreement.

"**Waived Fee Beneficiary**" means a Member whose obligation to contribute capital to the Company in cash is reduced through the Waived Fee as determined by the Manager, or in the absence of the Manager, the Investment Committee Chairman, all in accordance with the terms of this Agreement.

"**Waived Fee Income**" means income in the aggregate amount equal to the aggregate amount of Waived Fees and allocated to the Company first pursuant to Section ___ of the Partnership Agreement (and any equivalent proration of any agreement pertaining to any side by side fund controlled by principals of the General Partner).

## ARTICLE 2

### FORMATION, NAME AND TERM OF THE COMPANY

2.1     **Formation.** Pursuant to the Act, the parties caused the Company to be formed by filing Certificate of Organization (the "Certificate") with the Delaware Secretary of State. To the extent that any conflict exists between a provision of this Agreement and a provision of the Articles, the Articles shall govern.

2.2     **Name.** The Company was formed under the name "EQUINOX PARTNERS III, LLC" and shall conduct its business under that name or such other name as the Manager may from time to time determine.

2.3     **Term.** The term of the Company shall be perpetual, unless the Company is dissolved in accordance with any provision of this Agreement or the Act.

## ARTICLE 3

### PURPOSE

The Company is organized under Delaware law and is formed for the purpose of: acting as the general partner of the Partnership; investing in the Partnership; and engaging in any other lawful business or activity under the laws of Delaware.

5

## ARTICLE 4

### NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as set forth in Exhibit A attached hereto and incorporated herein by this reference, as the same may be amended from time to time to reflect changes in the membership of the Company.

## ARTICLE 5

### PRINCIPAL PLACE OF BUSINESS AND REGISTERED AGENT

5.1    **Principal Place of Business.**  The principal place of business of the Company shall be 41 West Putnam Avenue, Greenwich, CT 06830.  The Manager may from time to time, in his discretion, change the principal place of business, and may establish additional principal places of business of the Company.

5.2    **Registered Agent.**  The name of the registered agent and the address of the registered office for the Company shall be Lexis Document Solutions, 230 Old Rudnick Lane, Suite 100, Dover, 19901.  The Manager may from time to time, in his discretion, change the registered agent and registered office of the Company.

## ARTICLE 6

### CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

6.1    **Capital Contributions.**

(a)    In General.  At such times as required under the Partnership Agreement, each of the Members shall make the Capital Contributions set forth opposite his or her name on Exhibit A, as may be amended or adjusted from time to time.  Prior to the time of making an Investment, each Member shall be advised by the Investment Committee Chairman of the amount it is required to contribute to the capital of the Company in respect of such Investment and any additional amounts required to be invested if such contribution is not applicable to a particular Investment.  Each contribution of capital made to the Company by a Member in respect of an Investment shall be referred to as a "Capital Contribution".  Each Capital Contribution made by a Member shall be in cash. In the event that the Company is required to make additional Capital Contributions to the Partnership under the terms of the Partnership Agreement, the Members shall each be required to contribute their pro rata share of such contribution as determined by the Investment Committee Chairman.  The Member shall be required to make such additional Capital Contributions upon ten (10) days written notice from the Manager.  Such written notice shall set forth the aggregate amount of the capital contributions the Company is obligated to make to the Partnership and the additional Capital Contribution each Member is required to make to the Company.  No Member and no other person may make any loan or Capital Contribution to the Company without the consent of the Manager.

6

(b)    Member Clawback.  Under the terms of Section 8.12 of the Partnership Agreement, the Company may, from time to time, be required to repay to the Partnership all or a portion of the cash or property distributions previously made to the Members (the "**Clawback Amount**").  Each Member shall be required to pay to the Company a portion of such Clawback Amount in an amount determined by the Investment Committee Chairman taking into account the annual Sharing Percentage adjustments made over the term of the Company.  A Member's obligation under this Section 6.1(b) may be satisfied by any other Member, or by the Manager in its sole discretion should the other Members fail to satisfy in full the obligation of the non-contributing Member.  The party satisfying the obligations of the non-contributing Member shall have a right to contribution from the Member whose obligations are satisfied.  However, notwithstanding any other provision of this Agreement, the obligation of the Member to make any payment under this Section 6.1(b) shall (i) be several (and not joint and several with the other Members) and (ii) not exceed one hundred percent (100%) of the net after tax amount distributed (cash and non-cash) to such Member pursuant to Section 7.2, Section 7.3 and Section 18.3 of this Agreement.

(c)    Failure to Make Capital Contribution.  Upon the failure of any Member to make a required Capital Contribution, the Manager shall have the right, exercisable in its sole discretion, to (i) make the contribution as if he or she was a Member and to own permanently the applicable portion of the non-contributing Member's Membership Interest and the Sharing Percentage of such defaulting Member shall be adjusted proportionately and (ii) take any other action permitted under this Agreement, including enforce by legal proceedings the defaulting Member's obligation to make payment of such Capital Contributions.

(d)    Waived Fee.  Notwithstanding the other provisions of this Article 6, the Manager may, and in the absence of the Manager the Investment Committee Chairman may, in accordance with the terms of the Partnership Agreement, designate that a Member may waive a portion of the Management Fee payment allocated to such Member by the Investment Committee Chairman in lieu of contributing a portion of his or her Commitment to the Company and the Partnership.

## 6.2    Capital Accounts.

(a)    Establishment of a Capital Account.  There shall be established for each Member on the books of the Company, as of the date such Member is admitted to the Company, a separate general Capital Account and, as specific Investments are contemplated to be made, one or more separate Capital Accounts together with such special reserve capital accounts and such memorandum accounts as may be appropriate.  Each Capital Contribution (deemed or actual) by a Member made pursuant to Section 6.1 will be allocated to the appropriate capital account of such Member.  The Manager shall cause Capital Accounts to be otherwise adjusted as provided in this Article 6.

(b)    General Capital Account.  The general Capital Account of each Member shall be credited with (i) the amount of cash (and the fair market value of any property, net of liabilities assumed by the Company or to which the contributed property is subject)

contributed by such Member to the Company and not allocated to a Capital Account of such member in respect of a particular Investment, (ii) the amount transferred to the general Capital Account from a Capital Account of such Member in respect of a particular Investment, and (iii) the amount of Profits or other income allocated to such Member pursuant to Section 8.2, except Profits with respect to an Investment described in Section 6.2(c). The general Capital Account of each Member shall be debited by (i) the amount of cash (and the fair market value of property, net of liabilities assumed by the Member or to which the distributed property is subject), distributed from the general Capital Account to such Member, (ii) the amount transferred from the general Capital Account of such Member to such Member's capital account in respect of a particular Investment, and (iii) and item of loss, expense or deduction allocated to such Member pursuant to Section 8.2 hereof, except losses with respect to an Investment described in Section 6.2(c) hereof.

(c)  Investment Capital Account.  The Capital Account of each Member with respect to an Investment shall be credited with (i) the amount of cash (and the fair market value of any property, net of liabilities assumed by the Company or to which the contributed property is subject) contributed by such Member to the Company in respect of such Investment, (ii) the amount transferred from the general Capital Account of such Member to such Member's Capital Account in respect of such Investment, and (iii) the amount of Profits allocated to such Member in respect of such Investment pursuant to Section 8.2 hereof. The Capital Account of each Member with respect to an Investment shall be debited by (i) the amount of cash (and the fair market value of any property, net of liabilities assumed by the Member or to which the distributed property is subject) distributed from such Member's capital account in respect of such Investment, (ii) the amount transferred to the general capital account or special reserve account from such capital account in respect of such Investment, and (iii) any losses or other items of loss, expense or deduction allocated to such Member pursuant to Section 8.2 hereof in respect of an Investment.

(d)  Non Vested Profits Capital Account.  In the event that, consistent with Section 6.5(f) hereof, a special reserve in respect of Non-Vested Profits is established, separate special Capital Accounts shall be established for each Member in respect of his share of such Non-Vested Profits. The special reserve Capital Account of a Member in respect of Non-Vested Profits shall be credited with (i) all amounts (and the fair market value of any property, net of liabilities assumed by the Company or to which the transferred property is subject) transferred to such account from a Capital Account of such Member in respect of an Investment, or from the capital account of another Member upon a forfeiture pursuant to Section 6.5(f) hereof, and (ii) the amount of income or gain allocated to such Member pursuant to Section 8.2(d) hereof. The special reserve Capital Account shall be debited by (i) the amount of cash (and the fair market value of property, net of liabilities assumed by the Member or to which the distributed property is subject) distributed from the special reserve capital account to such Member, (ii) any item of loss, expense or deduction allocated to such Member pursuant to Section 8.2(d) hereof, and (iii) the amount transferred from the special reserve capital account of such Member to the special reserve capital account of another Member as a result of a forfeiture pursuant to Section 6.5(f) hereof.

8

(e)    Compliance with Section 704 of the Code.  It is the intention of the Members that the Capital Accounts of the Company be maintained strictly in accordance with the capital account maintenance requirements of Treasury Regulation Section 1.704-1(b) and Section 1.704-2.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts and the allocation of Company income, gain, loss and deductions are intended to comply with these Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations and any amendment or successor provision thereto.

(f)    Adjustments to Capital Accounts Upon a Sale.  Upon the sale or exchange of an interest in the Company, (i) if such sale or exchange causes a termination of the Company within the meaning of Code Section 708(b)(1)(B), the income tax consequences of the deemed distribution of Company property and the deemed immediate contribution of Company property to a new company (which for all other purposes continues to be the Company) shall be governed by the relevant provision of the Code and the Treasury Regulations promulgated thereunder, and the Capital Accounts of the Members shall be redetermined in accordance with this Article 6; or (ii) if such sale or exchange does not cause a termination of the Company within the meaning of the Code Section 708(b)(1)(B), the Capital Account of the selling or exchanging Member will be carried over to the transferee Member.

(g)    Revaluations.  Subject to Article 7 and Article 17, if, after the initial capital is contributed, money or property in other than a de minimis amount is contributed to the Company in exchange for a Membership Interest, or money or property is distributed to a Member in exchange for a Membership Interest but the Company is not liquidated, the Capital Accounts of the Members shall be adjusted based on the fair market value of Company property at the time of such contribution or distribution and the unrealized income, gain, loss or deduction inherent in the Company property which has not previously been reflected in the Capital Accounts shall be allocated among the Members as if there had been a taxable disposition of the Company property at its fair market value on such date.  The fair market value of contributed, distributed or revalued property shall be established by the Manager.  If property of the Company has a fair market value different than its tax basis to the Company at the time of contribution, distribution or revaluation so that the fair market value rather than tax basis of such property is used to determine the Capital Accounts of the Member, depletion, depreciation, amortization and gain or loss with respect to such property shall be computed on the basis of its fair market value using the same method and period as used for tax purposes and the Capital Accounts of the Members shall be adjusted for their respective shares of such depletion, depreciation, amortization, and gain or loss on the basis of fair market value rather than tax basis.  Depletion, depreciation, amortization, and gain or loss shall then be allocated to each Member for tax purposes, to the maximum extent possible, to eliminate any disparity between the Capital Accounts of the Members if they had been accounted for using tax basis and the Capital Accounts computed using the fair market value of such property.  For this purpose, the Capital Account using the tax basis of a Member who receives a distribution giving rise to a special basis adjustment to Company property under Code Section 734(b) shall be adjusted in an amount corresponding to such basis adjustment.

(h)     No Obligation to Restore Deficit Balance.  Nothing herein shall be construed to impose upon any Member an obligation to contribute additional capital or to restore a deficit Capital Account balance upon liquidation or dissolution of the Company.

6.3     No Interest on or Demand for Return of Contributions.  No Member shall be entitled to receive any interest on his Capital Contribution or Capital Account balance, or to have the right to demand the return of his Capital Contributions or Capital Account balance.

6.4     Loans from Members.  The Manager shall have the authority from time to time to borrow on behalf of the Company from any Member (including the Manager) funds for the Company in such amounts as he shall deem necessary to further the business of the Company. Any loans made by a Member to the Company shall be repayable and bear interest on terms and at a rate no less favorable to the Company than the terms and rates chargeable by a commercial bank to similar commercial borrowers on an unsecured basis unless otherwise agreed to by a majority of the Members voting in accordance with their Sharing Percentages.

6.5     Vesting.  Prior to the commencement of each Company Year (except the initial Company Year commencing on the date hereof and ending on December 31), the Investment Committee Chairman shall determine the Sharing Percentage of each Member with respect to all Investments to be made by the Partnership (and indirectly the SBIC Partnership) during such Company Year as may be adjusted during the course of the Company Year as a result of a Member becoming a Terminated Member or as a result of an admission of a new Member pursuant to Article 16 hereof. The Sharing Percentages for each Company Year shall be attached as an exhibit to this Agreement.

(a)     The Sharing Percentage of each Member with respect to each Investment shall vest as follows:

(i)     fifteen percent (15%) of such Sharing Percentage shall vest on the last day of the Company Year in which such Investment is made;

(ii)     an additional twenty-five percent (25%) shall vest on the last day of the first calendar year subsequent to the Company Year in which such Investment is made; and

(iii)     an additional thirty percent (30%) shall vest on the last day of each of the second and third calendar years subsequent to the Company Year in which such Investment is made.

(b)     If a Member becomes a Terminated Member due to such Member's termination as employee of the Manager "for Cause" at any time during the term of the Company, then, in such event, (A) such Member shall forfeit, without any further action on the part of the Company or any other Member, the theretofore vested portion of its Sharing Percentage for each Investment, and (B) no further vesting shall occur in respect of such Member's Sharing Percentage for each Investment. The theretofore vested and unvested portion of such Member's Sharing Percentage (including any unvested portion of the Non-Vested Profits special reserve capital account) may thereafter be reallocated

10

by the Investment Committee Chairman, in his sole discretion, to any other Member, in any percentage(s) which he may determine. In the event of any such reallocations, and on each such occasion, the unvested portion of a Terminated Member's Sharing Percentage shall vest, following its having been reallocated, according to the vesting schedule of such Terminated Member in respect of such Sharing Percentage.

(c)    In the event that a Member voluntarily terminates his or her employment with the Manager, then, in any such event, (i) such Member shall retain the vested portion of his or her Sharing Percentage for each Investment, and (ii) no further vesting shall occur in respect of such Member's Sharing Percentage. The Investment Committee Chairman, in his sole discretion, may reallocate the unvested portion of such Member's Sharing Percentage (including any unvested portion of the Non-Vested Profits special reserve capital account) to any other Member or Members;

(d)    In the event that the Investment Committee Chairman does not reallocate the vested portion and/or unvested portion, if any, of any Sharing Percentages forfeited pursuant to any of the two preceding paragraphs, such interests shall, pending such reallocation by the Investment Committee Chairman (which the Investment Committee Chairman may make at any time prior to the earlier to occur of (A) the last calendar day of the third month of the Company Year following the Company Year in which the applicable Member became a Terminated Partner or was otherwise removed or (B) the sale of the applicable Investment), be deemed to have reallocated to the other Members (other than the Terminated Partner) in proportion to each such Member's Sharing Percentage with respect to such Investment.

(e)    Notwithstanding anything to the contrary provided in this Section 6.5, the unvested portion of the Sharing Percentage of a Member with respect to an Investment shall become fully vested upon the earliest to occur of (i) the discharge, other than for Cause, of such Member, (ii) the death or permanent disability, as reasonably determined by the Investment Committee Chairman in its sole discretion, of such Member, and (iii) in such other instances as the Investment Committee Chairman in its sole discretion shall determine; provided, however, that no such acceleration of the vesting of the unvested portion of the Sharing Percentage of a Member shall occur in the event that such Member is terminated as an employee of the Manager for "Cause."

(f)    In the event of a sale or other disposition of an Investment prior to such time as a Member is fully vested with respect to his Sharing Percentage for the subject Investment, fifty percent (50%) of such Member's share of Profits attributable to the unvested portion of his Sharing Percentage shall be immediately vested upon such sale or other disposition of such investment and the remaining fifty percent (50%) of such Member's share of Profits attributable to the unvested portion of his Sharing Percentage (such remaining fifty percent (50%) interest referred to herein as the "Non-Vested Profits") shall continue to be subject to the vesting and forfeiture provisions of this Section 6.5 and shall be credited to the special reserve capital account established for such Member. A Member's share of such Non-Vested Profits shall be distributed to such Partner at such time(s) as such amounts become vested. A Member's share of Non-

11

Vested Profits which are forfeited pursuant to this Section 6.5 shall be reallocated in the manner provided in Section 6.5 hereof. In the event of a material increase in the applicable marginal income tax rate(s), the Investment Committee Chairman may, in his sole discretion, adjust the percentage of Profits attributable to a Member's unvested Sharing Percentage which vests upon the sale or other disposition of an Investment.

6.6    **Fees Generated From Portfolio Companies.**  The Members agree that all fees (directors, management, consulting and other similar fees) received by the Members for work performed for Portfolio Companies shall be contributed to the Manager.

## ARTICLE 7

## DISTRIBUTIONS

7.1    **Distribution Policy.**

(a)    <u>General</u>.  Subject to Sections 7.3 and 18.3, distributions shall be made at such times and in such amounts as the Manager shall determine in its sole discretion, in the order of priority set forth in Section 7.2.

(b)    <u>In-Kind Distributions</u>.  In the event that any property is distributed in kind by the Company to a Member (including distributions in liquidation of the Company), such distribution shall be made on the basis of the fair market value of the property distributed, and the Capital Accounts of the Members shall be adjusted immediately before such distribution to reflect the income, gains, losses and deductions that would have been realized by the Members under this Agreement if the distributed property had been sold on the date of its distribution for its fair market value.

7.2    **Distributions.**

(a)    Profits allocated to a Partner pursuant to Section 8.2 hereof shall be distributed to such Member promptly after receipt by the Company. In the case of allocable Non-Vested Profits, the Manager shall establish a special reserve of the Company equal to the amount of such Non-Vested Profits, which reserve shall be credited to a special reserve capital account established pursuant to Section 7.3 hereof and which reserve shall be distributed to the Member as provided in Section 6.5(f) hereof. Allocable Non-Vested Profits held in reserve on behalf of a Member shall be invested by the Manager in such "marketable" Securities as the Manager in its sole discretion shall determine.

(b)    Proceeds available for distribution in respect of amounts allocated to a Member pursuant to Section 8.2(a) resulting from the sale or other disposition of an Investment shall be distributed to such Member promptly after receipt by the Company. Other Profits shall be distributed by the Manager promptly after their receipt by the Company.

12

(c)    Amounts distributed to the Company as a return of a capital contribution resulting from a sale or other disposition of all or a portion of an Investment, shall be distributed by the Company to the Members promptly after receipt in proportion to the amounts contributed by such Members to the Company in order to allow the Company to make such capital contribution.

(d)    Distributions of profits, income and gain allocated pursuant to Section 8.2 hereof shall be made at the times determined by the Manager and only to the extent not required for the operations of the Company.

(e)    Distributions of profits, income and gain allocated pursuant to Section 8.2(d) hereof shall be made at the times determined by the Manager.

(f)    The Manager may also elect to distribute cash, Securities and other property of the Company to the Members if such property is not required for the operations of the Company.  Any distribution made pursuant to this Section 7.2 shall be made to the Members in the proportion that such cash, Securities or property were allocated to the Members pursuant to Section 8.2.

(g)    Except to the extent otherwise provided herein, no Member shall be obligated to return all or any portion of the Capital Contributions made by the Members and no Member shall be entitled to interest on all or any part of the Capital Contributions made by such Member. Except to the extent otherwise provided herein, no Member shall have priority over any other Member either as to the return of the Capital Contributions made by such Member or as to allocations of Profits or losses.

(h)    Distributions attributable to amounts received by the Company on account of Waived Fees shall be made to the Waived Fee Beneficiaries designated by the Manager (or in the absence of the Manager, the Investment Committee Chairman) in accordance with the respective amounts by which their obligations to make a Capital Contribution have been reduced by Waived Fees not previously the subject of a distribution pursuant to this Section 7.2(h) until such amounts have been reduced to zero.

7.3    **Reserves.**  The Manager may reserve from distributions any amount it determines to be necessary to pay obligations of the Company reasonably anticipated and not otherwise provided for; provided, however, that any such amounts reserved pursuant to this Section 7.3 shall only be reserved out of Profits in respect of an Investment.  The Manager may at any time release any funds as reserved and any interests earned thereon or increment thereto and distribute them to the Members, as provided by Section 7.2 who participated in the Investment from which the funds so reserved were derived, and shall, in any event, release and distribute such funds when the matter giving rise to the creation of such reserved by the Manager has, in the opinion of the Manager, been resolved.  The Manager shall, on a quarterly basis, review the need for any reserves it has established and provide the Members affected by such reserved with written notice of the status of all Company matters which gave rise to the creation of such reserves.

13

**7.4    Valuation.** For all purposes of this Agreement, including, without limitations, for purposes of Section _____ hereof, any Securities or other assets of the Company as of any date (or in the event such date is not a business day, as if the next succeeding business day) shall be valued as the Investment Committee Chairman shall determine in good faith. All Valuation decisions pursuant to this Section 7.4 shall be made in good faith by the Investment Committee Chairman in his sole discretion and shall be final.

**7.5    Minimum Distribution.** Notwithstanding any other provision in this Agreement to the contrary, to the extent of available partnership receipts or as otherwise provided in any loan documents between the Company and a lender, the Manager shall cause the Company to distribute to each Member within seventy-five (75) days following the end of each fiscal year, an amount equal to such Member's allocable share of the Company's Net Profits for such year as determined under Article 8, multiplied by the combined highest federal and applicable state income tax rate in effect for such year (the "Minimum Distribution"). Any Minimum Distribution received by a Member shall be credited against and reduce the amount of distributions that such Member is otherwise entitled to receive under this Article.

**7.6    Unallocated Interests.** The Company will hold proceeds from all unallocated Sharing Percentages in a separate account. Once the Investment Committee allocates any or all of the unallocated Sharing Percentages, the proceeds in the separate account shall be distributed to the appropriate Member. To the extent there are unallocated Sharing Percentages at the end of each year, the Investment Committee Chairman shall allocate the Net Profit and Net Loss attributable to such unallocated Sharing Percentages among the Members and shall distribute to each Member amounts sufficient to discharge each Member's federal, state, and local income tax liabilities arising from such unallocated Sharing Percentages.

## ARTICLE 8

## GENERAL TAX ALLOCATIONS

**8.1    Profits and Losses.** Profits and losses of the Partnership for any fiscal period shall, except as otherwise provided herein, be calculated on the cash receipts and disbursements basis (except in those circumstances in which items of income or loss are required to be taken into account on the accrual method basis for federal income tax purposes). The Investment Committee Chairman shall calculate the amount of net profit or loss of the Company in respect of a Company Year following the close of such year; provided, however, that any profit or loss realized by the Company upon the sale or other disposition by the Partnership (or the SBIC Partnership) of any Investment or portion thereof shall be calculated by the Investment Committee Chairman and credited or debited to the capital accounts of the appropriate Members promptly following any such sale or other disposition.

**8.2    Allocations.**

(a)    The Sharing Percentage of a Member, either as originally determined by the Investment Committee Chairman or as adjusted, shall entitle a Member to participate in the profits in respect of an Investment made by the Partnership (or indirectly the SBIC Partnership) (the "Profits Interest").

14

(b)     Except as otherwise provided in this Agreement, all Profits and losses and other items of deduction or expenses allocated to the Company in respect of an Investment shall be allocated to the Members for such Investment in proportion to each such Member's Sharing Percentage with respect to such Investment. In addition, each such Member shall be allocated profits in an amount equal to an eight percent (8%) annual rate of return on each Member's funded Capital Contributions.

(c)     Except as otherwise provided in Section 8.2(d), all other items of income, gain, loss, deduction or expense not directly attributable to an Investment shall be allocated to all Members in proportion to each Member's respective Capital Contributions.

(d)     All income, gain, loss, deductions or expense attributable to investments comprising any special reserve(s) established in accordance with Sections 6.5(f) and 7.2(a) in respect of Non-Vested Profits shall be allocated to each Member in respect of whom such a special reserve capital account for Non-Vested Profits has been established.

(e)     Waived Fee Income shall be allocated to the Waived Fee Beneficiaries designated by the Manager (or in the absence of the Manager, the Investment Committee Chairman) in accordance with the respective amounts by which their obligations to make a Capital Contribution in cash have been reduced by Waived Fees not previously the subject of allocation of income pursuant to this Section 8.2(e) until such amounts have been reduced to zero.

## ARTICLE 9

## SPECIAL TAX ALLOCATIONS

**9.1     Qualified Income Offset.** Notwithstanding any other provision of this Agreement, any Member who unexpectedly receives an adjustment, allocation, or distribution described in subparagraphs (4), (5) or (6) of Treasury Regulation Section 1.704-1(b)(2)(ii)(d), which has not otherwise been taken into account in determining such Member's Deficit Limitation, and which causes a deficit balance in such Member's Capital Account in excess of such Member's Deficit Limitation, shall be allocated items of book income and gain in an amount and manner sufficient to eliminate or to reduce, as quickly as possible, the excess deficit so created or increased. This provision is intended to constitute a "qualified income offset" as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith. Such section of the Treasury Regulations shall control in the case of any conflict between that Section of the Treasury Regulations and this Section 9.1.

**9.2     Minimum Gain Chargeback.** Notwithstanding any other provision of this Agreement, in the event of a net decrease in Minimum Gain for a taxable year, each Member shall be allocated items of Company income and gain for such year (and if necessary subsequent years) equal to that Member's Share of the net decrease in Minimum Gain. This provision is intended to constitute a minimum gain chargeback provision within the meaning of Treasury Regulation Section 1.704-2(f) and shall be interpreted in a manner consistent therewith.

15

**9.3    Nonrecourse Loan by a Member.** Notwithstanding any other provision of this Agreement, in the event that a nonrecourse liability of the Company is loaned to the Company by a Member or guaranteed by a Member such that such Member bears the economic risk of loss with respect to that liability as described under Treasury Regulation Section 1.752-2, the following shall apply: (i) the Member's Deficit Limitation shall be increased by the amount described in Treasury Regulation Section 1.704-2(i)(5); and (ii) the rules under Treasury Regulation Section 1.704-2(i) shall govern the allocation of any items of income, gain, loss or deduction in connection with such liability.

**9.4    Allocation of Profit, Gain and Loss on Transfer of Membership Interest.** The profit, gain or loss allocable to any Membership Interest in the Company which may have been transferred during any year shall be allocated among the persons who were the holders of such interest during such year in proportion to the number of calendar days that each such holder was recognized as the owner of the interest during such year, without regard to (i) the results of Company operations during the period in which the holders were recognized as the owners thereof, and (ii) the date, amount or recipient of any distributions which may have been made with respect to such interest; provided, that the allocation of gain or loss on the disposition of any property or interest in which the Company has a direct or indirect interest shall be based on the Membership Interests of the Members on the date the event giving rise to such gain or loss occurs.

**9.5    Code Section 754 Election.** If there is a transfer of a Membership Interest permitted by this Agreement, or if there is a distribution of Company property to a Member, at the request of a transferee or a distributee, the Manager shall cause the Company to file an election pursuant to Code Section 754 to cause the tax basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Code Section 734 or Code Section 743, as may be applicable.

**9.6    Code Section 704(c) Allocations.** In accordance with Code Section 704(c) and the Treasury Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose book value differs from its adjusted basis for federal income tax purposes, shall, for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its book value. Any elections or other decisions relating to such allocations shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 9.6 are solely for purposes of federal, state, and local taxes and shall not effect, or in any way be taken into account in computing, any Member's share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Agreement.

**9.7    Application of Special Allocation Provisions.** To the extent possible, the Company, in allocating items of income, gain, loss, or deduction among the Members pursuant to this Article 9, shall take into account the special allocations in such a manner that the net amount of allocations to each Member shall be the same as such Member's allocable share of Net Profits, Net Losses or other items of gain or loss would have been had the events requiring the special allocations not taken place. The Company shall apply the provisions of this Article 9

16

in whatever order the Manager reasonably determines will minimize any economic distortion that otherwise might result from the application of the special allocations.

   **9.8     Terminated Member.** The Company shall allocate such items of income, gain, loss and deductions to a Terminated Member so as necessary to comply with the provisions of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder.

   **9.9     Target Final Balances.** The tax allocation provisions of this Agreement are intended to produce final Capital Account balances that are at levels ("Target Final Balances") which would permit liquidating distributions that are made in accordance with such final Capital Account balances to be equal to the distributions that would occur under Article 7. To the extent that the tax allocation provisions of this Agreement would not produce the desired Target Final Balances, the Members agree to take such actions as are necessary to amend such tax allocation provisions to produce such Target Final Balances. Notwithstanding the other provisions of this Agreement, allocations of income, gain, loss, and deductions shall be made prospectively as necessary to produce such Target Final Balances (and to the extent such prospective allocations would not effect such result, the prior tax returns of the Company shall be amended to reallocate income, gain, loss and deductions to produce such Target Final Balances).

## ARTICLE 10

## BOOKS OF ACCOUNT, RECORDS AND REPORTS

   **10.1     Books and Records.** The Company shall maintain books of account and records (at the principal place of business of the Company) on the basis utilized in preparing the Company's federal income tax return, incorporating the accrual or cash method of accounting, as the Manager may determine to be in the best interest of the Company, and such other records as may be required in connection with the Partnership's federal, state and local income tax returns or other tax returns or reports or to make the computations called for in Section 10.2, including, without limitation, records reflecting the Capital Accounts and allocations thereto.

   **10.2     Reports to Current and Former Members.** Within 90 days after the end of each fiscal year, the Manager shall cause the an independent certified public accounting firm to prepare and mail (a) to each Member and (b) to each former Member (or its legal representatives), to the extent necessary, the Schedule K-1 and any other reporting information required for such fiscal year to enable such Member or former Member (or its legal representatives) to prepare their respective income tax returns in accordance with any laws, rules and Treasury Regulations then prevailing.

   **10.3     Tax Returns and Information.** The Manager shall cause the Company to prepare and timely file all federal and state income tax returns and other required tax returns of the Company.

   **10.4     Fiscal Year.** The fiscal year of the Company shall end on the thirty-first day of December in each year.

   **10.5     Tax Matters.** For purposes of Code Section 6231 and all other applicable sections of the Code, the "tax matters partner" of the Company shall be Equinox Capital , Inc.

17

## ARTICLE 11

### COMPANY FUNDS

The funds of the Company shall be deposited in such bank account or accounts, or invested in such interest bearing investments, as shall be designated by the Manager. All withdrawals from any such bank accounts shall be made by persons duly authorized by the Manager. Company funds shall not be commingled with those of any other person.

## ARTICLE 12

### MANAGEMENT

**12.1** **The Manager.** Subject to Section 12.2, the business and affairs of the Company shall be managed exclusively by the Manager. Except for situations in which the approval of the Members is expressly required by this Agreement or by non-waivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. No Person dealing with the Manager shall be required to determine its authority and Persons dealing with the Company may rely upon the representation of the Manager that it has the authority to make any commitment or undertaking on behalf of the Company.

**12.2** **Limitation on Authority.** Notwithstanding any other provision of this Agreement, any decision described in Section 13.4 shall be made by the Investment Committee.

**12.3** **Number, Tenure and Qualifications** The Company shall have one Manager. The Manager shall hold office until he is removed pursuant to Section 12.6. Managers need not be residents of the State of Delaware or Members of the Company.

**12.4** **Liability for Certain Acts.** The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, willful misconduct, breach of this Agreement or a wrongful taking by the Manager.

**12.5** **Vacancies.** In the event of a vacancy in the position of a Manager for any reason, a successor Manager shall be appointed by the Investment Committee Chairman.

**12.6** **Manager Resignation.**

(a)    Voluntary Resignation. The Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

18

(b)    Involuntary Resignation. At a meeting called expressly for that purpose, the Manager may be removed at any time for embezzlement or gross negligence, if the Manager is adjudicated incompetent by a Court of competent jurisdiction, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, makes an assignment for the benefit of creditors, or admits in writing that he is unable to pay his debts as they mature.

(c)    Member-Manager. In the event of the resignation of a Manager pursuant to this Article 12, if the Manager is also a Member of the Company, the interest of such Manager in the profits, losses, cash, property and other distributions of the Company shall continue as if such Manager had not resigned; provided that such interest shall thereafter be held as a non-manager Member, and provided further that, if the event giving rise to the resignation of the Manager also results in an involuntary transfer of such Manager's Membership Interest to a guardian, conservator or legal representative of the Manager, or to any other party, only the interest of the Manager in the profits, losses, distributions and property of the Company shall be so transferred and, as provided under Section 15.4 below, the transferee shall have no vote or other prerogative, right or privilege of a Member or of a Manager.

**12.7    Compensation and Expenses.**

(a)    The Manager shall be compensated in accordance with the Management Agreement entered into by and between the Company and the Manager.

(b)    The Company shall reimburse the Manager for any legal expenses reasonably incurred by the Manager in connection with the formation, organization and capitalization of the Company, including the legal fees incurred in connection with negotiating and drafting this Agreement.

(c)    The Manager may, in his sole discretion, cause the Company to make an appropriate election to treat the expenses incurred by the Company in connection with the formation and organization of the Company to be amortized under the 60-month period beginning with the month in which the Company begins business to the extent that such expenses constitute "organizational expenses" of the Company within the meaning of Code Section 709(b)(2).

**12.8    _Other Business and Investment Opportunities._** The Manager shall not be required to manage the Company as such Manager's sole and exclusive function and the Manager may have other business interests and may engage in other activities in addition to those relating to the Company except as otherwise limited by such Member's Employment Agreement. Neither the Company nor any Member shall have any right, by virtue of this, to share or participate in such other investments or activities of the Manager and/or Members or to the income or proceeds derived therefrom. Neither the Manager nor any Member shall incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture.

19

**12.9    Employment of Others.** Nothing in this Agreement shall preclude the Manager from employing, at the expense of the Company, any agent or third party to manage or provide other services in respect of the Company assets subject to the control and supervision of the Manager.

**12.10    Validity of Transactions with Affiliates.** The validity of any transaction, agreement or payment involving the Company and any affiliate of a Manager, otherwise permitted by the terms of this Agreement, shall not be affected by reason of the relationship between the Manager and such affiliate, as the case may be.

**12.11    Indemnity.**

(a)    Standard of Care.

(i)    Neither the Manager, any Member, any Investment Advisor/Manager, any member of any advisory committee, nor any partner, member, shareholder, director, officer or employee nor any affiliate of any thereof shall be liable to the Company or any Member for any action taken or omitted to be taken by it or any other Member or other person in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful.

(ii)    Neither any Manager, Member, any member of any advisory committee, nor any member of any Company committee or board who is not an affiliate of the Manager or Member, shall be liable to the Company or any Member as the result of any decision made in good faith by such Manager, Member, committee member or board member, in his capacity as such.

(iii)    The Manager, any Member, any Investment Advisor/ Manager, and the stockholders, directors, officers, employees and partners of any thereof, may consult with reputable legal counsel selected by them and shall be fully protected, and shall incur no liability to the Company or any Member, in acting or refraining to act in good faith in reliance upon the opinion of advice of such counsel.

(b)    Indemnity.

(i)    The Company shall indemnify and hold harmless, but only to the extent of Assets Under Management, the Manager, the Members, any Investment Advisor/Manager, any member of any advisory committee, and any partner, shareholder, director, officer, employee or any affiliate of any thereof from any and all costs, expenses, damages, claims, liabilities, fines and judgments (including the reasonable cost of the defense of any claim or action and any sums which may be paid with the consent of the Company in settlement thereof) which may be incurred by or asserted against such person or entity, by reason of any action taken or omitted to be taken on behalf of the Company and in furtherance of its interests.

20

(ii)    The Company shall indemnify and hold harmless, but only to the extent of Assets Under Management, the Manager, the Members, and the members of any Company committee or board who are not affiliates of the Manager or Members, or any Investment Advisor/Manager from any and all costs, expenses, damages, claims, liabilities, fines and judgments (including the reasonable cost of the defense of any claim or action and any sums which may be paid with the consent of the Company in settlement thereof) which may be incurred by or asserted against such person or entity, by any third party on account of any matter or transaction of the Company, which matter or transaction occurred during the time that such person has been a Manager, Member, member of a Company committee or board who is not an affiliate of the Manager, any Investment Advisor/Manager.

(iii)    The Company shall have power, in the discretion of the Manager, to agree to indemnify on the same terms as set forth in Section 12.2(b)(ii) any person who is or was serving, pursuant to a prior written request from the Company, as a consultant to, agent for or representative of the Company or of the Partnership as a director, officer, employee, agent of or consultant to another corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such.

(iv)    No person shall be entitled to claim any indemnity or reimbursement under Section 12.11(b)(i), (ii), or (iii) in respect of any cost, expense, damage, liability, claim, fine, judgment (including any cost of the defense of any claim, action, suit, proceeding or investigation, by or before any court or administrative or legislative body or authority) that may be incurred by such person which results from the failure of such person to act in accordance with the provisions of this Agreement and the applicable standard of care set forth in Section 12.11(a).The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, preclude a determination that such person acted in accordance with the applicable standard of care set forth in Section 12.11(a).

(v)    To the extent that a person claiming indemnification under Section 12.11(b)(i), (ii), or (iii) has been successful on the merits in defense of any action, suit or proceeding referred to in Section 12.11(b)(i), (ii), or (iii) or in defense of any claim, issue or matter therein, such person shall be indemnified with respect to such matter as provided in such Section. Except as provided in the foregoing sentence and as provided in Section 12.11(b)(vii) with respect to advance payments, any indemnification under this Section 12.11(b) shall be paid only upon determination that the person to be indemnified has met the applicable standard of conduct set forth in Section 12.11(a)(i) or (ii).

(vi)    A determination that a person to be indemnified under this Section 12.2 has met the applicable standard set forth in Section 12.1(a)(i) or (ii) shall be made by (A) the Manager, with respect to the indemnification of any

21

person other than a person claiming indemnification under Section 12.11(b)(i), or (B) at the election of the Manager, independent legal counsel selected by the Manager, with respect to the indemnification of any person indemnified under Section 12.11(b), in a written opinion.

(vii)    In making any such determination with respect to indemnification under Section 12.2(b)(vi), the Manager or independent legal counsel, as the case may be, shall be authorized to make such determination on the basis of its evaluation of the records of the Manager, the Company or any Investment Advisor/Manager to the Company and of the statements of the party seeking indemnification with respect to the matter in question and shall not be required to perform any independent investigation in connection with any such determination. Any party making any such determination is authorized, however, in its sole discretion, to take such other actions (including engaging counsel) as it deems advisable in making such determination.

(viii)    Expenses incurred by any person in respect of any such costs, expenses, damages, claims, liabilities, fines, and judgments (including any cost of the defense of any claim, action, suit, proceeding or investigation, by or before any court or administrative or legislative body or authority) may be paid by the Company in advance of the final disposition of any such claim or action upon receipt of an undertaking by or on behalf of such person to repay such amount unless it shall ultimately be determined as provided in Section 12.11(b)(v) or (vi) that such person is entitled to be indemnified by the Company as authorized in this Section 12.11.

(ix)    The rights provided by this Section 12.11(b) shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of each person eligible for indemnification hereunder.

(x)    The rights to indemnification provided in this Section 12.11(b) shall be the exclusive rights of all Members to indemnification by the Company. No Member shall enter into, or make any claim under, any other agreement with the Company (whether direct or indirect) providing for indemnification. The Manager shall not enter into any agreement with any person which is an employee, officer, director, partner or shareholder, or an affiliate, associate or control person of any of the foregoing, providing for indemnification of any such person unless such agreement provides for a determination with respect to such indemnification as provided under Section 12.11(b)(vi)(B). The provisions of this Section 12.11(b) shall not apply to indemnification of any person which is not at the expense (whether in whole or in part) of the Company.

(xi)    The Company may purchase and maintain insurance on its own behalf, or on behalf of any person or entity, with respect to liabilities of the types described in this Section 12.11(b). The Company may purchase such insurance regardless of whether such person is acting in a capacity described in this

22

Section 12.11(b) or whether the Company would have the power to indemnify such person against such liability under the provisions of this Section 12.11(b).

## ARTICLE 13

### INVESTMENT COMMITTEE

**13.1**    **Investment Committee.** Notwithstanding any other provision of this Agreement, all decisions relating to an Investment and decisions specified in Section 13.4 below shall be made by a committee (the "Investment Committee" shall consist of Steven Rodger, John Weschler and Mark Durfee. Steven Rodger shall be the Chairman of the Investment Committee (the "Investment Committee Chairman"). Each member of the Investment Committee shall have one (1) vote. Members of the Investment Committee may resign at any time by giving written notice to the Investment Committee Chairman. The Investment Committee Chairman may resign from the Investment Committee by giving written notice to the other members of the Investment Committee.

**13.2**    **Automatic Removal From The Investment Committee.** In the event that a Member's employment with Manager is terminated for any reason, such Member shall cease to be a member of the Investment Committee, with no further action necessary. Unless and until such removed member of the Investment Committee is replaced pursuant to Section 13.3, the remaining members of the Investment Committee shall constitute a quorum for purposes of determining those matters set forth in Section 13.4.

**13.3**    **Replacement of Investment Committee Members.** In the event a vacancy arises in the membership of the Investment Committee, a replacement member shall be selected by the Investment Committee Chairman.

**13.4**    **Authority.** The Investment Committee will have exclusive authority over all of the following matters:

(a)    any investment in or divestiture (or partial divestiture) by the Partnership of a Portfolio Company, or add-on acquisitions for or divestitures by any Portfolio Companies to the extent the Partnership has approval authority related thereto or is committing additional capital for such event;

(b)    the exercise of the Partnership's rights of first refusal, registration rights, preemptive rights and similar rights arising from Portfolio Company Investments;

(c)    the disposition of any investment by the Partnership whether by sale, merger, public offering or other exit strategy;

All decisions by the Investment Committee shall be by a majority vote of the Investment Committee, which majority vote must always include the affirmative of the Investment Committee Chairman.

**13.5**    **Meetings.** Meetings of the Investment Committee shall be held at the principal place of business of the Company or at any other place that the Manager may determine.

23

Meetings may be had by conference telephone, provided that each member of the Investment Committee can hear the others. Meetings of the Investment Committee shall be held in accordance with a schedule established by the Investment Committee Chairman. In addition, any other member of the Investment Committee may call a meeting of the Investment Committee upon at least two (2) days' prior written notice to the members of the Investment Committee. Attendance at a meeting, either in person or by telephone, shall constitute a waiver of such notice, unless such attendance is solely for the purpose of objecting to lack of adequate notice and the objecting member of the Investment Committee does not participate any further in the meeting. The Investment Committee also may make decisions, without holding a meeting, by unanimous written consent of the members of the Investment Committee. Provided the Investment Committee Chairman is present, the attendance of a majority of the members of the Investment Committee at a meeting either in person or by telephone, shall constitute a quorum for the purpose of transacting business. No business may be transacted without a quorum.

## ARTICLE 14

## RIGHTS OF MEMBERS

**14.1**    **Limitation of Liability.**  Except as provided by the non-waivable provisions of the Act and by this Agreement no Member shall be liable for an obligation of the Company solely by reason of being or acting as a Member.

**14.2**    **Actions Requiring the Consent of the Members.**  Except as otherwise provided in Articles 12 and 13 hereof or in the non-waivable provisions of the Act, the consent of the Members shall not be required to make any act of the Company or of the Manager valid.

**14.3**    **Meetings.**  Meetings of the Members, for any purpose, unless otherwise prescribed by statute, may be called by the Manager upon five (5) days' written notice, or, in the event the Manager has resigned, by the Members collectively holding a majority of the Sharing Percentages for the year in which such meeting is called upon five (5) days written notice. Meetings of the Members shall be held at the principal place of business of the Company, or at such other place designated in the notice. Members may participate in meetings in person, by proxy, or by telephone.

**14.4**    **Action by Members Without a Meeting.**  Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, and is signed by all Members entitled to vote with respect to the subject matter thereof.

## ARTICLE 15

## RESTRICTIONS ON TRANSFER

**15.1**    **General Restriction.**  Except as otherwise provided herein, a Member may not sell, transfer, assign, pledge or otherwise encumber the whole or any part of his Membership Interest in the Company, either directly or indirectly, without obtaining the prior written consent of the Manager. Any purported transfer or assignment of a Membership Interest not permitted by this Article 15 shall be null and void and of no effect whatsoever. The non-transferring

Members may, in addition to all other rights and remedies available to them in law or in equity, obtain injunctive relief to prohibit any prospective breach of this Article 15.

15.2 **Involuntary Transfer.** In the event of the death, court declaration of incompetency, bankruptcy, or dissolution of a Member, or other proposed involuntary transfer of a Membership Interest, either directly or indirectly, or the occurrence of any event which would transfer by operation of law or otherwise, the Membership Interest of a Member in the Company to another party, only the interest of such Member in the profits, losses, distributions and property of the Company shall be transferred to such Member's guardian, legal representative, heirs, successors or assigns, as the case may be, and such transferee shall have no vote or other prerogative, right or privilege of a Member unless such transferee becomes a Substitute Member of the Company upon complying with the provisions of Section 15.4 below.  No legal representative, guardian or other transferee of the transferring Member shall have the right to demand the value of such Member's Membership Interest in lieu of the rights of that Member to the profits, losses and distributions of the Company as provided in this Agreement.

15.3 **Ownership Change.** In the event a Member undergoes a voluntary or an involuntary Ownership Change, the rights of such Member in the profits, losses, distributions and property of the Company shall continue, but the right of such Member to vote, and all other rights and privileges of such Member as a Member and/or Manager of the Company shall cease unless such Member obtains the prior written consent of all the remaining Members to such Ownership Change.

15.4 **Substitute Member.** Notwithstanding anything else to the contrary in this Agreement, in the event of any sale, exchange, transfer or assignment of a Membership Interest permitted pursuant to this Article 15, such assignee or transferee shall become a Substitute Member of the Company only upon (i) obtaining the prior written consent of the Manager; and (ii) executing and delivering to the Company a written instrument pursuant to which he, she or it agrees to be bound by all of the provisions of this Agreement. Until such consent and instrument are obtained, executed and delivered to the Company, such assignee or transferee shall only be entitled only to the transferring Member's allocable share of the profits, losses, distributions and property of the Company and to no other rights as a Member.

15.5 **Withdrawal of a Member.** Except as otherwise specifically permitted in this Agreement, each Member agrees not to voluntarily withdraw from the Company. A Member purporting to voluntarily withdraw shall be considered a Terminated Member (as defined in Section 17.1 hereof) and the rights of such Member shall be governed by Article 17 hereof.

15.6 **Legal Effect.** Any person admitted to the Company as a new or Substitute Member shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement.

15.7 **Opinion of Counsel.** Notwithstanding the foregoing, no sale or assignment of a Membership Interest may be made if the sale or assignment would result in the termination of the Company under Section 708 of the Code and no such sale or assignment may be made unless the Company receives an opinion of counsel, satisfactory in form and substance to the Manager, to the effect that (i) there will be no adverse tax consequences to the remaining Members as a

consequence of such sale or assignment, and (ii) the transfer is covered by proper exemptions from registration under applicable securities laws.

## ARTICLE 16

## ADDITIONAL MEMBERS

16.1    **Admission.** From the date of the formation of the Company, any person acceptable to the Manager may become a Member in this Company upon such person's execution of this Agreement. The Manager may at any time and from time to time, assign to one or more new Members a Sharing Percentage with respect to a particular Investment made prior to such person becoming a Member of the Company. In such event, all Members with respect to such Investment shall have their Sharing Percentage reduced, on a pro-rata basis, in order to create such Sharing Percentage for such other Member(s); provided, however, that in no event shall a Member's overall interest with respect to any Investment be reduced to a level which is less than seventy five percent (75%) of such Member's Sharing Percentage, as initially allocated, with respect to such Investment. On each occasion on which the Manager, acting pursuant to this Section 16.1, allocates or reallocates to a newly admitted Member who has an interest in the profits interest with respect to an Investment (an "Admission Event"), the Manager shall, prior to such allocation ascribe a value (as appropriate) to such Investment in accordance with Section 7.4 as of the date on which the Admission Event occurs (each, a "Market Date"), and the capital accounts of the Members with respect to each such Investment shall be adjusted, via separate memorandum account, to reflect the unrealized profits or losses of the Company with respect to each such Investment determined as though each such Investment had been sold for its then ascribed Fair Value and all profits or losses with respect to each such Investment were allocated to each Member in accordance with Section 8.2. The Manager shall notify each such Member of its Sharing Percentage, either as allocated or as adjusted, in respect of each such Investment promptly thereafter, including varying interests, if any, in respect of different Profit amounts attributable to such Investment as a result of the marking to market of the capital accounts of the Members as of the Market date. It is intended that each Sharing Percentage initially allocated and the additional reallocated portion, if any, of each Sharing Percentage allocated pursuant to this Section 16.1 in respect of Investments theretofore made shall entitle the recipient of any such interest to share only in Profits attributable to, and realized on, the corresponding Investment from and after the Market Date and only to the extent in excess of the ascribed value on such Market Date.

## ARTICLE 17

## TERMINATION

17.1    **Termination of Membership Interest.** The Manager has entered into certain employment agreements with each Member (the "Employment Agreements"), which Employment Agreements may be terminated pursuant to the terms thereof. In the event that an Employment Agreement is terminated pursuant to the terms thereof, the person whose Employment Agreement is terminated (the "Terminated Member") shall cease to be a Member of the Company.

26

**17.2    Rights of Terminated Member**. The Terminated Member shall not be entitled to a distribution of the fair market value of his Membership Interest upon withdrawal. Except as provided in Section 17.3 hereof, the Terminated Member shall have no further rights to receive distributions from the Company, and shall have no vote or other prerogative, right or privilege of a Member.

**17.3    Payments for Membership Interest of Terminated Member**. The Terminated Member shall have the right to receive: (a) within thirty (30) days of termination, any portion of the Capital Contributions of the Terminated Member to the Company which have not been (i) previously utilized to make an Investment in a Portfolio Company by the Partnership, or (ii) expended by the Company or Partnership to pay the operating expenses of the Company or Partnership, as the case may be, and (b) at the same time and in the same form as distributions are received by the Members, distributions in accordance with Section 7.2 hereof. Except as provided in this Section 17.3 or in a Member's employment agreement, the Terminated Member shall have no right to share in, or to receive payments from the Company and all payments received by a Terminated Member shall be treated as payments in liquidation of such Terminated Member's Membership Interest.

**17.4    Terminated Member Clawback**. To the extent that a Clawback Amount is payable (or forecast to be payable), the Terminated Member shall be required to pay to the Company the portion of such Clawback Amount, in an amount determined by the Investment Committee Chairman. The Company may set-off any funds otherwise owed to the Terminated Member under Section 17.3 of this Agreement against the Terminated Member's obligation under this Section 17.4. In the event that any other Member shall satisfy the Terminated Member's obligation or forecasted obligation under this Section 17.4, such Member shall have a right of contribution from the Terminated Member. However, notwithstanding any other provision of this Agreement, the obligation of the Terminated Member to make any payment under this Section shall not exceed one hundred percent (100%) of (a) the net after tax amount distributed to such Terminated Member pursuant to Section 7.2(a) of this Agreement, plus (b) the aggregate amount of payments (cash and non cash) made to such Terminated Member pursuant to Section 17.3 of this Agreement.

## ARTICLE 18

## DISSOLUTION OF THE COMPANY

**18.1    Events of Dissolution**. The Company shall be dissolved upon the occurrence of any of the following events:

> (a)    the unanimous written consent of all of the Members;

> (b)    the death, retirement, resignation, bankruptcy, court declaration of incompetence, or dissolution of the Manager.

**18.2    Winding-Up**. In the event of the dissolution of the Company for any reason, the Manager shall commence to wind up the affairs of the Company and to liquidate its investments in an orderly manner. The Members shall continue to share profits and losses during the period of liquidation in the same proportion as before the dissolution. The Manager shall have full right

and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation having due regard to the activity and condition of the relevant market and general financial and economic conditions.

18.3    **Allocation and Distribution of Proceeds.** Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Manager to set up such cash reserves as he may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company (including any clawback obligations pursuant to Section 9.3(c) of the Partnership Agreement), the proceeds of the liquidation and any other funds of the Company shall be distributed to the Members in proportion to their positive Capital Account Balances.

18.4    **Source of Distributions.** Each holder of an interest in the Company shall look solely to the assets of the Company for all distributions with respect to the Company and its capital contribution thereto and share of profits or losses thereof, and shall have no recourse therefore (upon dissolution or otherwise) against any Manager or any Member except in conjunction with prior obligations under Section 6.1 and 17.4 of this Agreement.

18.5    **Termination.** Upon the completion of the liquidation of the Company and the distribution of all Company funds, the Company shall terminate and the Manager shall have the authority to execute and file Articles of Dissolution as well as any and all other documents required to effectuate the dissolution and termination of the Company.

## ARTICLE 19

### NOTICES AND POWER OF ATTORNEY

19.1    **Notices.** Unless otherwise provided hereunder, all notices and demands required or permitted under this Agreement shall be in writing and may be hand-delivered or sent by telefax, certified or registered mail, postage prepaid, or a private delivery service to the Members at their addresses as shown from time to time on the records of the Company. Any Member may specify a different address by notifying the Manager in writing of such different address.

19.2    **Grant of Power of Attorney.** Each Member hereby irrevocably constitutes and appoints the Manager as its true and lawful attorney and agent, in its name, place and stead to make, execute, acknowledge and, if necessary, file and record:

(a)    Any certificates or other instruments or amendments thereof which the Company may be required to file under the Act and the laws of the State of Delaware, Illinois or Connecticut or pursuant to the requirements of any governmental authority having jurisdiction over the Company or which the Members shall deem it advisable to file, including, without limitation, this Agreement, any amended Agreement and a certificate of termination as provided in Section 18.5.

(b)    Any certificates or other instruments (including counterparts of this Agreement with such changes as may be required by the law of other jurisdictions) and all amendments thereto which the Manager deem appropriate or necessary to qualify, or continue the qualification of, the Company as a limited liability company and to preserve

the limited liability status of the Company in the jurisdictions in which the Company may acquire investment interests.

(c)    Any certificates or other instruments which may be required in order to effectuate any change in the membership of the Company or to effectuate the dissolution and termination of the Company pursuant to Article 18.

(d)    Any amendments to any certificate or to this Agreement necessary to reflect any other changes made pursuant to the exercise of the powers of attorney contained in this Article or pursuant to Section 19.2.

**19.3    Irrevocable and Coupled with an Interest; Copies to Be Transmitted.**    The powers of attorney granted under Section 19.2 shall be deemed irrevocable and to be coupled with an interest. A copy of each document executed by the Manager pursuant to the powers of attorney granted in Section 19.2 shall be transmitted to each Member promptly after the date of the execution of any such document.

**19.4    Survival of Power of Attorney.**    The powers of attorney granted in Section 19.2 shall survive delivery of an Assignment by any Member of the whole or any part of such Member's membership Interest, provided that if such Assignment was of all of such Member's Membership Interest and the substitution of the assignee as a Substitute Member has been consented to by the Manager, the foregoing powers of attorney shall survive the delivery of such Assignment for the purpose of enabling the Manager to execute, acknowledge and file any and all certificates and other instruments necessary to effectuate the substitution of the assignee as a Substitute Member. Such powers of attorney shall survive the death, incapacity, dissolution or termination of a Member and shall extend to such Member's successors and assigns.

## ARTICLE 20

### MISCELLANEOUS

**20.1    Amendments.**    All provisions of this Agreement may be amended by the Manager, provided that any provision relating to (i) the amount of any distribution a Member is entitled to receive; (ii) the amount of any Net Profits or Net Losses of the Company to be allocated to a Member; (iii) the term of the Company; (iv) the circumstances under which a Member may transfer his or her Membership Interest in the Company; (v) the right or obligation of any Member to contribute capital or make loans to the Company; (vi) the rights of a Member upon liquidation of the Company; (vii) the events causing a dissolution of the Company; (viii) actions of the Company requiring the consent of a Member; (ix) the right of a Member to withdraw from the Company; (x) the liability of such Member for the debts, obligations, and liabilities of the Company; and (xi) the right of a member to indemnification and expense reimbursement related thereto may be amended only with the written consent of the affected Members.

**20.2    Limitation on Liability.**    Except as otherwise provided by applicable law or expressly agreed to in writing by any Member, no Member shall have any personal liability whatsoever, whether to the Company, to any of the Members or to the creditors of the Company,

for the debts of the Company or any of its losses beyond the amount committed by such Member to the capital of the Company.

20.3    **Partition Waived.** The Members agree that the Company's interests, properties and investments are not and will not be suitable for partition. Accordingly, each of the Members hereby irrevocably waives any and all rights that he may have to maintain any action for partition of any of such interests, properties or investments.

20.4    **Entire Agreement.** This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof. It supersedes any prior agreement or understandings among them, and it may not be modified or amended in any manner other than as set forth herein.

20.5    **Governing Law.** This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware.

20.6    **Binding Effect.** Except as herein otherwise specifically provided, the Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns.

20.7    **Gender and Number.** Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine line, feminine and neuter.

20.8    **Captions.** Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope of any provision hereof.

20.9    **Severance.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

20.10   **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. In addition, this Agreement may contain more than one counterpart of the signature page and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages; all of such counterpart signature pages shall be read as though one, and they shall have the same force and effect as though all the signers had signed a single signature page.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement as of the day and year first above written.

MEMBERS:

_____
Steven Rodger

_____
John Wechsler

_____
Mark Durfee

_____
Michael S. Novoseller

MANAGER:

EQUINOX CAPITAL, INC.,
a Delaware corporation

By: _____
        Steven Rodger, President

31

## EXHIBIT A

## MEMBERS NAMES, ADDRESSES AND CAPITAL CONTRIBUTION

| Name and Address | Capital Contribution |
|---|---|
| Steven Rodger<br>41 West Putnam Avenue<br>Greenwich, CT  06830 | 37.78% |
| John Weschler<br>41 West Putnam Avenue<br>Greenwich, CT  06830 | 17.11% |
| Mark Durfee<br>41 West Putnam Avenue<br>Greenwich, CT  06830 | 37.78% |
| Michael S. Novoseller<br>41 West Putnam Avenue<br>Greenwich, CT  06830 | 7.33% |

1

EXHIBIT B

PARTNERSHIP AGREEMENT

## EXHIBIT C

## SHARING PERCENTAGES

| Name | Sharing Percentage |
|------|--------------------|
| Steven Rodger | 41.25% |
| Mark Durfee | 35.00% |
| John Wechsler | 17.50% |
| Michael S. Novoseller | 6.25% |

## EMPLOYMENT AGREEMENT

EFFECTIVE DATE: December 1, 2004

**PARTIES AND ADDRESSES:**

EQUINOX CAPITAL, INC. (the "Company")
41 West Putnam Avenue
Greenwich, CT 06830
(203) 622-1605 x12
(203) 622-4684 Fax

Mark F. Durfee ("Executive")
717 Barrister Court
Franklin Lakes, NJ 07417

### RECITALS:

A.    The Company is a Delaware corporation organized to act as the Manager of EQUINOX PARTNERS III, LLC, a Delaware limited liability company (the "General Partner") and EQUINOX SBIC PARTNERS, LLC, a Delaware limited liability company (the "SBIC General Partner"). The General Partner has been formed to act as the general partner of a limited partnership formed to be the parent fund of a Small Business Investment Company ("SBIC") licensed by the U.S. Small Business Administration ("SBA"). The limited partnership is known as EQUINOX CAPITAL III, L.P., a Delaware limited partnership (the "Parent Fund"). The limited partnership formed to be an SBIC is known as EQUINOX CAPITAL SBIC, L.P., a Delaware limited partnership (the "SBIC Fund"). Together, the Parent Fund and SBIC Fund shall be referred to as the "Fund."

B.    The parties anticipate that the Fund initially will be funded with appropriate initial capital, and thereafter will be funded as needed for investment from the Fund's partners, and such "leverage" funding as the SBIC Fund may acquire from the SBA.

C.    The Company desires to employ Executive, and Executive desires to be employed by the Company, on the terms and conditions set forth herein. This Employment Agreement will be referred to as the "Agreement."

D.    Contemporaneously with the execution of this Agreement, Executive will be a Member of the General Partner pursuant to the terms and conditions set forth in the General Partner's Operating Agreement and a Member of the SBIC General Partner pursuant to the terms and conditions set forth in the SBIC General Partner's Operating Agreement. All terms not otherwise defined herein shall have meaning as ascribed to such terms in the General Partner's Operating Agreement or the SBIC General Partner's Operating Agreement.

1217244-v.1

## AGREEMENTS:

In consideration of the mutual promises and undertakings set forth herein the Company and Executive agree as follows:

### ARTICLE I

### Employment, Duties and Authority

1.1    **Employment.** Commencing on the Effective Date, the Company hereby employs Executive as a senior executive with the titles of "Principal", "Partner", or "Managing Director" pursuant to the terms of this Agreement, and Executive hereby accepts such employment for the Term as provided in <u>Article 3</u> herein. The period from the Effective Date to the end of the first calendar year shall be the "Stub Year" and then each calendar year after the Stub Year hereafter is referred to as an "Employment Year."

1.2    **Duties and Authority.**

  (a) Executive agrees to devote all of his working time and best efforts to the business of the Company, including without limitation (i) the day-to-day operations of the Company and the Fund in a manner consistent with guidelines established by the President of the Company, the General Partners of the Fund; (ii) obtaining an SBIC license pursuant to 13 C.F.R. 107 (the "SBIC Rules") for the SBIC Fund (the "SBIC License"), and (iii) seeking, analyzing, and recommending to the Investment Committee of the Company investment opportunities consistent with applicable SBIC Rules and with underwriting guidelines established from time to time by the Company.

  (b) Executive shall report to, and at all times shall be subject to the direction of, the Company's President.

1.3    **Best Efforts.** Executive agrees that he shall at all times faithfully, industriously, and to the best of his ability, perform all of the duties that may be required of and from him by the Company, that he will perform such other reasonable duties as are assigned to him pursuant to the express and implied terms and conditions of this Agreement to the reasonable satisfaction of the Company, as determined by the Company's President.

2

## ARTICLE 2

### Compensation

2.1    **Base Compensation and Benefits.**

(a)    **Salary.** The Company shall pay Executive a base salary of up to $200,000 per year (subject to appropriate withholding and payable with the Company's normal payroll). Such base salary will be determined by applying 67% of any management fees, net of any associated expenses, generated from limited partnership interests closed upon at the Parent Fund in excess of $11,705,000 up to a maximum base salary of $200,000 (subject to appropriate withholding and payable with the Company's normal payroll). At the end of the Stub Year, and at the end of each Employment Year thereafter, increases or decreases in annual base salary shall be determined by the President.

(b)    **Reserved.**

(c)    **Discretionary Bonus.** The Company may pay Executive a Discretionary Bonus at the end of the Stub Year and each Employment Year thereafter. Amount and payment of the Discretionary Bonus shall be made by Company's President.

(d)    **Vacation.** Executive shall be entitled to six weeks of paid vacation each full Employment Year. Such vacations may be taken at such time or times as the Executive may choose, but shall be scheduled in such manner as to avoid interference with the performance of his duties and obligations to the Company. In the event that Executive does not take all vacation time to which he is entitled in any given year, he shall not be entitled to additional compensation nor permitted to accumulate or carry such time over to the succeeding year.

(e)    **Other Benefits.** Executive shall be eligible to participate in all benefit plans now or hereafter offered to full-time employees of the Company, including, without limitation, pension or profit sharing plans, and Executive shall be entitled to participate in all health, dental, life or disability insurance plans made available to other full-time employees of the Company.

3

## ARTICLE 3

### *Term and Termination*

**3.1**   **Term.** The term of the Agreement shall be from and after the Effective Date until the end of such calendar year (the "Term"). The Term shall automatically renew for successive terms of one year each (a "Renewal Term"), unless the Company delivers notice of non-renewal prior to the expiration of Term or Renewal Term or unless otherwise terminated under <u>Section 3.2</u>, upon the terms and conditions set forth in this Agreement, as such may be modified by mutual written agreement of the parties from time to time.

**3.2**   **Events of Termination.** Executive's employment shall terminate hereunder:

(a)   effective upon the date set forth in written notice from the Company delivered at any time after June 30, 2005, if the SBIC Fund has not received approval of the Executive by the SBA to serve on the investment and elects to terminate this Agreement before such approval is received. Notwithstanding anything in this Agreement to the contrary, upon termination of Executive's employment under this <u>Section 3.2(a)</u>, Executive will have no rights under this Agreement other than collecting such portion of the base compensation due and payable on a pro rata basis through the date of termination and Executive will be relieved of all obligations under this Agreement other than Executive's obligations set forth in <u>Articles 3 and 4</u>;

(b)   effective upon the date set forth in a mutual written agreement of the parties;

(c)   immediately upon the death of Executive;

(d)   immediately upon the discontinuance of the business of the Company, the Parent Fund or the SBIC Fund;

(e)   effective upon the date set forth in the Company's written notice to Executive for "Cause."

(i)   For this purpose "Cause" means (A) material misconduct or dishonesty; (B) conduct of a criminal nature that may have an adverse impact on the Company's reputation and standing, in the community; (C) fraudulent conduct in connection with the business *affairs of the Company*; (D) any bar against Executive from serving as a director, officer or employee of any firm the securities of which trade publicly or of any licensed SBIC; (E) material breach by Executive of his obligations, duties, and responsibilities under any term or provision of this Agreement; or (F) gross negligence or willful misconduct *in the performance of* Executive's duties hereunder.

(ii)    The Company shall give Executive written notice of proposed termination under this Section 3.2(e) (the "Cause Notice"), which provides reasonable detail as to the cause and sets forth the date of a meeting of the Company's Board of Directors, which date shall be no sooner than five days after the date on which the Cause Notice is given. At such meeting, Executive will honor requests by the Board of Directors, at the meeting to leave the meeting to allow for discussion by the Board of Directors without Executive present. At such time as the Board of Directors reach a decision with respect to Executive's termination, whether at the meeting set forth in the notice to Executive, or at a subsequent meeting, if the decision to terminate Executive is affirmed by the Board of Directors, Executive will be given written notice of such affirmation and Executive's employment will terminate on the date set forth in such notice.

(f)    effective upon the date set forth in the Company's written notice to Executive.

**3.3    Compensation Upon Termination of Executive's Employment.** In the event that Executive's employment with the Company terminates (other than for "Cause"), the Company shall pay Executive's base salary through the effective date of termination plus an additional three (3) months of salary. Upon termination for "Cause", base salary shall be paid through the effective date of termination.

**3.4    Exclusive Rights Upon Termination.** Except as expressly provided in this Article 3, Executive shall not be entitled to any severance or other payments in connection with the expiration of this Agreement or the termination of Executive's employment hereunder.

**3.5    Return of Company Property.** Promptly following termination of Executive's employment, he shall return to the Company, or destroy at the Company's request, all corporate documents, records, files, credit cards, computer disks and tapes, computer access card, codes and keys, file access codes and keys, building and office access cards, codes and keys, materials, equipment and other property of the Company and/or the Fund which is in Executive's possession or under his control.

**3.6    Termination of Membership Interest.** Effective immediately upon termination of Executive's employment, Executive shall cease to be (i) a Member of the General Partner in accordance with the terms of General Partner's Operating Agreement; (ii) a member of the Investment Committee of the General Partner in accordance with the terms of the General Partner's Operating Agreement; (iii) a Member of the SBIC General Partner in accordance with the terms of its operating agreement; (iv) a member of the Investment Committee of the SBIC General Partner in accordance with the terms of its operating agreement; and (v) an officer of the Company.

**3.7    Withholding.** All payments made to Executive under this Agreement, whether prior to or following termination of employment, shall be reduced by amounts (i) required to be

withheld in accordance with federal, state and local laws and regulations in effect at the time of payment, or (ii) owed to the Company, the General Partner, SBIC General Partner or the Fund by Executive for any amounts advanced, loaned or misappropriated. The provisions of this Section 3.7 shall survive termination of this Agreement by either party for any reason.

## ARTICLE 4

### Confidential Information

**4.1    Definition.** "Confidential Information" as used in this Article 4 means information (a) that is not generally known to the public and (b) that is proprietary to the Company, the General Partner, SBIC General Partner or the Fund or that the Company is obligated to treat as proprietary. Confidential Information shall include, without limitation, investment strategies, financial information about the Company, the General Partner, the SBIC General Partner and the Fund, any of their investments, or their portfolio companies, and any other information that the Company reasonably considers or treats as Confidential Information, or that Executive actually knows or reasonably should know that the Company, the General Partner, the SBIC General Partner or the Fund considers or treats as Confidential Information (whether Executive or others originated it and regardless of how Executive obtained it).

**4.2    Use Prohibited.** Except as required in his duties to the Company, Executive will never knowingly, either during or after his employment by the Company, use or disclose Confidential Information to any person not authorized by the Company, the General Partner, the SBIC General Partner or the Fund to receive it, excluding, Confidential Information (a) which becomes publicly available through a source other than Executive, (b) which is made public by the Company, (c) which is received by Executive after termination of this Agreement from a third party who obtained the information on a non-confidential basis from the Company, or (d) which Executive is compelled to disclose in any judicial or administrative proceeding. Promptly upon termination of Executive's employment with the Company, Executive will turn over to the Company all records, documents, materials and any compositions, articles, devices, apparatus and other items that disclose, describe or embody Confidential Information, including all copies and reproductions thereof, in Executive's possession, regardless of who prepared them.

**4.3    Violation by Executive.** If it is determined by an arbitration proceeding, or a final, non-appealable judgment of a court of law or equity that Executive has breached Article 4 with regard to material information, the Company, in addition to any other remedies available at law or equity, may withhold any further payments to Executive under any provision of this Agreement or the Operating Agreements.

## ARTICLE 5

### Competitive Activities Prohibited

**5.1    Prohibition: Duration.** Executive agrees that, during his employment with the Company and for a period of twenty-four (24) months immediately following termination thereof for any reason, Executive will not alone, or in any capacity with another firm, individual or persons:

(a)     in any way interfere or attempt to interfere with the Company's, the General Partner's, the SBIC General Partner's or the Fund's relationships with the Limited Partners of the Partnership or any of the companies or entities in which the Company, the General Partner, the SBIC General Partner or the Fund has invested or is considering making an investment; or

(b)     employ or attempt to employ any of the Company's employees, or the employees of any enterprise managed or owned by the Company, the General Partner, the SBIC General Partner or the Fund on behalf of any other entity competing with the Company, the General Partner, the SBIC General Partner or the Fund.

5.2     **Exceptions.** Nothing in Article 4 and Section 5.1 shall restrict the Executive from (a) owning passive investments in publicly traded securities not exceeding five percent (5%) of the issuer's capital stock, or (b) disclosing to third parties the name, amount invested, investment returns, and the Executive's role on transactions on which Executive worked.

5.3     **Violation by Executive.** If it is determined by an arbitration proceeding or a final non-appealable judgment of a court of law or equity that Executive has breached Article 5 in a material manner the Company, the General Partner, the SBIC General Partner and the Fund, in addition to any other remedies available at law or equity, may withhold any further payments to Executive under any provision of this Agreement or the Operating Agreements.

5.4     **Notice to New Employer.** Executive will, prior to accepting employment with any new employer, inform that employer of this Agreement and provide that employer with a copy of Article 5 of this Agreement.

## ARTICLE 6

### Remedies

6.1     **Equitable Remedies.** The parties acknowledge that the Company, the General Partner, the SBIC General Partner and the Fund will suffer irreparable harm if the Executive breaches Section 3.5 and/or Articles 4 and/or 5 of this Agreement, either during or after its term. Accordingly, the Company shall be entitled to any right or remedy it may have, under this Agreement or otherwise, at law or equity, including but not limited to, an injunction, enjoining or restraining Executive from any violation of Section 3.5 and/or Articles 4 and/or 5 of this Agreement.

6.2     **Judicial Remedies.** All disputes under this Agreement shall be determined, at the discretion of the President of the Company, by (i) the Circuit Court in Cook County, Illinois, (ii) the Courts of the State of New York, or (iii) or the Federal Courts of the United States located in (a) Cook County, Illinois, or (h) New York, New York and each of the parties hereto irrevocably consents to the personal jurisdiction of such courts and the discretion of the President of the Company to determine such court.

7

6.3    **Costs.** The Company and Executive will bear their own respective costs and expenses in connection with any proceedings pursuant to this Agreement.

## ARTICLE 7

### Miscellaneous

7.1    **Successors and Assigns.** This Agreement is binding on and inures to the benefit of the Company, and its successors and assigns. The Company agrees that the Company shall be deemed to have materially breached this Agreement if its successor or assign does not assume all of the Company's material obligations under this Agreement.

7.2    **Modification.** This Agreement supersedes all prior agreements and understandings between the parties. This Agreement may be modified or amended only by a writing, signed by the Company and Executive.

7.3    **Waivers.** No failure or delay by either the Company or Executive in exercising any right or remedy under this Agreement shall be deemed a waiver of any provision of this Agreement. Nor shall any single or partial exercise by either the Company or Executive of any right or remedy under this Agreement preclude either from otherwise or further exercising rights or remedies granted under this Agreement.

7.4    **Notices.** Any and all notices referred to herein shall be deemed properly given if in writing and given by personal delivery, telex, telegram, facsimile, electronic mail, private courier service or registered or certified mail or delivered personally or sent postage prepaid, by certified mail, return receipt requested, as follows:

        (a)     To the Company, to the attention of the Company's Board of Directors at their office as set forth in the Company's records or at such other address as the Company may specify in writing to Executive, with a copy to:

                Alan B. Roth
                Wildman, Harrold, Allen & Dixon
                225 West Wacker Drive, Suite 2800
                Chicago, Illinois 60606

        (b)     To Executive at his home address, including electronic mail address, as it then appears on the records of the Company, it being the duty of the Executive to keep the Company informed of his current home address and electronic mail address at all times.

The date on which notice to the Company or Executive shall be deemed to have been given if mailed as provided above shall be the date on the certified mail return receipt. Personal delivery or electronic mail to Executive shall be deemed to have occurred on the date notice was delivered to Executive personally by a representative of the Company or any messenger or other delivery service including electronic delivery.

7.5    **Judicial Review, Severability.** In the event that a court of competent jurisdiction determines that any of the provisions of this Agreement are unreasonable, it may limit such provision to the extent it deems reasonable, without declaring the provision or this Agreement invalid in its entirety. This provision shall not be construed as an admission by the Company, but is only included to provide the Company with the maximum possible protection for its business and Confidential Information, consistent with the right of the Executive to earn a livelihood subsequent to the termination of his employment.

To the extent any portion of any provision of this Agreement shall be deemed invalid or unenforceable, it shall be considered deleted herefrom and the remainder of such provision and the remainder of this Agreement shall be unaffected and shall continue in full force and effect.

The Company and Executive desire that this Agreement shall be given the construction which renders its provisions valid and enforceable to the maximum extent, not exceeding its express terms, permissible under applicable law.

7.6    **Governing. Law.** This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware.

7.7    **Entire Agreement.** This Agreement constitutes the entire agreements of the parties with respect to the subject matter of such agreements and supersedes all previous proposals or agreements, oral or written, and all negotiations, conversations or discussions heretofore had between the parties related to the subject matter of such agreements.

7.8    **Survival.** All terms and provisions hereof intended to be observed and performed by the parties after the termination hereof, shall survive such termination and continue thereafter in full force and effect, subject to applicable statute of limitations.

7.9    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

7.10    **Titles and Headings: Construction.** The titles and headings to Sections herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring, construction hereof against the party causing this Agreement to be drafted.

7.11    **Benefit.** Nothing in this Agreement or the agreements referred to herein, expressed or implied, shall confer on any person other than the parties hereto or thereto, or their respective permitted successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, the agreements referred to herein, or the transactions contemplated herein or therein.

9

IN WITNESS WHEREOF, the Company and Executive have executed this Agreement as of the effective date set forth above.

EQUINOX CAPITAL, INC.

By: _____

     Steven C. Rodger
     President


EXECUTIVE:


_____

     Mark F. Durfee

10

